**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DR. JEROME CORSI, et al

               Plaintiffs

      v.

INFOWARS, LLC, et al

               Defendants.

              **Case Number:   1:19-cv-656**
         **ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Dated: May 13, 2019

Respectfully Submitted,

    */s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
D.C.  Bar Number: 334581
2020 Pennsylvania Ave NW #800
Washington, DC, 20006
Telephone:  (310)-595-0800
Email: leklayman@gmail.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

LEGAL ARGUMENT ...........................................................................................................2

  This Court May Properly Exercise Personal Jurisdiction Over Defendants............................2

    The District of Columbia Long Arm Statute .....................................................................2

    Due Process Clause ...........................................................................................................5

  Venue is Proper in the District of Columbia.............................................................................6

  Defendants' Motion to Dismiss Under Rule 12(b)(6) Must Be Denied .....................................7

    Legal Standard ..................................................................................................................7

    Plaintiffs Properly Pled Claims for Defamation, Defamation by Implication, and
    Defamation Per Se ............................................................................................................8

      Plaintiffs are not Public Figures....................................................................................10

      Plaintiffs' Defamation Allegations are Properly Pled ...................................................12

        The October 26, 2018 Video ......................................................................................13

        The January 18, 2019 Video .......................................................................................15

        Other Defamatory Publications...................................................................................18

    Intentional Infliction of Emotional Distress .......................................................................19

    Assault.............................................................................................................................20

    Lanham Act Unfair Competition .....................................................................................21

  CONCLUSION....................................................................................................................22

## **TABLE OF AUTHORITIES**

**Cases**

*Aetna Life Ins. Co. v. Brewer*, 12 F.2d 818 (D.C. Cir. 1926) .......................................................10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................7

*Abraham v. Baldwin*, 42 So. 591, 592 (Fla. 1906)...........................................................................8

*Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013) .........................................................................19

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)....................................................................6

*Bruce v. Potomac Elec. Power Co.*, 162 A.3d 177 (D.C. 2017)......................................................22

*Competitive Enter. Inst. v. Mann*, 150 A.3d 1213 (D.C. 2016) ........................................................9

*Covey Run, LLC v. Wash. Capital, LLC*, 245 F. Supp. 3d 9 (D.D.C. 2017).....................................2

*Dingle v. District of Columbia*, 571 F.Supp.2d 87, 98 (D.D.C. 2008) ..........................................20

*Devincci Salah Hourani v. Mirtchev*, 796 F.3d 1 (D.C Cir 2015) ....................................................9

*Dimick v. Schiedt*, 293 U.S. 474 (U.S. 1935)...................................................................................8

*Glynn v. City of Kissimmee*, 393 So. 2d 774 (Fla. 5th DCA 1980) ..................................................8

*Gordon v. United States Capitol Police*, 778 F.3d 158 (D.C. Cir. 2015) ........................................7

*GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) .................................2

*Guilford Transp. Indus. v. Wilner*, 760 A.2d 580 (D.C. 2000).....................................9, 13, 15, 19

*Hourani v. PsyberSolutions LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016) .......................................5, 6

*Homan v. Goyal*, 711 A.2d 812 (D.C. 1998) ..................................................................................19

*Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72 (Tex. App. El Paso 1998)...................19

*In re M.L.P.*, 936 A.2d 316 (D.C. 2007)........................................................................................22

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017)...........................................12

*Keeton v. Hustler, Inc.*, 465 U.S. 770 (1984)...................................................................................5

*Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240 (S.D. Fla. 2014)......................................11

*Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 112 (D.D.C. 2009).........................................11

*Saucier v. Countrywide Home Loans*, 64 A.3d 428 (D.C. 2013) ...............................................9, 10

*Shaw v. R.J. Reynolds Tobacco Co.*, 818 F. Supp. 1539 (M.D. Fla. 1993) .....................................8

*Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287 (1980) ...........................................................10, 11

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ......................................................8

**Statutes**

28 U.S.C. §1391(b)(2) .......................................................................................................................6

Fed R. Civ. P 12(b)(6)..............................................................................................................7, 8

D.C. Code § 13-423(a).............................................................................................................2, 3

## MEMORANDUM OF LAW

## I.    INTRODUCTION

This case is centered around Defendants' latest at pecuniary gain and notoriety through their pattern and practice of spewing false, malicious, and defamatory statements. Now, in collaboration and in concert with their co-conspirator and co-actor, Roger Stone ("Stone"), Defendants are doing everything that he can to smear, discredit, and threaten Plaintiffs Jerome Corsi ("Plaintiff Corsi") and Larry Klayman ("Plaintiff Klayman") in order to try to help Stone avoid prison time for his role Special Counsel Robert Mueller's Russian collusion investigation, for which he was indicted on seven separate felony charges and has a pending criminal case in this judicial district.

To that end, using InfoWars and the other Defendants as his platform and agents, Stone had already made numerous false, malicious, and defamatory statements in public in order to try to improperly influence and corrupt Mr. Mueller's investigation and now prosecution, which again, is centered in this judicial district. Stone, by and through the Defendants, has falsely accused Plaintiff Corsi of repeatedly lying, the crime of committing perjury, and being an alcoholic who has no capacity for memory, among a myriad of other defamatory published statements as pled in the Complaint. It is easy to see why Stone is knowingly and maliciously using the Defendants to publish these defamatory of statements – he is trying to do everything in his power to discredit, coerce, intimidate, and threaten Plaintiff Corsi and his legal counsel, co-Plaintiff Larry Klayman.  Plaintiff Corsi had no choice but to cooperate with Mr. Mueller's investigation, and if subpoenaed, to testify truthfully at Stone's trial. Tellingly, Plaintiff Corsi was not indicted, while Stone was. This speaks for itself.

Defendants have now stepped in to aid their co-conspirator, Stone, who works as a co-

host along with Defendant Shroyer's and Defendant Alex Jones on *The War Room*, which is broadcasted on the InfoWars website and through other outlets into this judicial district, in hopes of not only discrediting Plaintiffs to aid Stone, but also to eliminate them as competitors. Defendants have published a myriad of outrageous and unrestrained lies and blatant falsities that have severely damaged the reputation, good will and personal and professional relationships and financial well being of both Plaintiff Corsi and Plaintiff Klayman.[1]

## II    LEGAL ARGUMENT

### A.    This Court May Properly Exercise Personal Jurisdiction Over Defendants

This Court may exercise personal jurisdiction over Defendants if Plaintiffs satisfy the District of Columbia Long Arm Statute and the Due Process Clause of the U.S. Constitution. *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Crucially, Plaintiffs need only satisfy the burden of establishing the factual basis for asserting personal jurisdiction with a *prima facie* showing. *Covey Run, LLC v. Wash. Capital, LLC*, 245 F. Supp. 3d 9, 13 (D.D.C. 2017). As such, "plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial[;] but rather, the plaintiff may rest her arguments on the pleadings, bolstered by such affidavits and other written materials as [he] can otherwise obtain." *Id*. (internal quotations omitted). Furthermore, any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Id*. at 17.

### 1.    The District of Columbia Long Arm Statute

The District of Columbia Long Arm Statute is satisfied here under two grounds: (1)

---

[1] Plaintiffs would like to bring to the Court's attention what may be a lack of transparency on counsel for Defendants, Marc Randazza, Esq.'s, *pro hac vice* application. Whereas Mr. Randazza only points the Court to the "stayed suspension" that was "issued by the Nevada Supreme court in In re Marc J. Randazza, Bar No. 12265, No. 76543 (Nev. Oct. 10, 2018)," there appears to be many more transgressions that were not reported. Indeed, recently, a Connecticut judge denied Mr. Randazza's *pro hac vice* application, citing "serious misconduct." Exhibit 1. The attached article details Mr. Randazza's transgressions. Exhibit 1.

Defendants transacts business in the District of Columbia under D.C. Code § 13-423(a)(1) and (2) Defendants caused "tortious injury in the District of Columbia by an act or omission outside the District of Columbia [and] he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia under D.C. Code § 13-423(a)(4). Importantly, under the express terms of the District of Columbia Long Arm Statute, the Court may exercise personal jurisdiction stemming not only from the Defendant's personal actions, but also those acting on behalf of the Defendant. ("A District of Columbia Court may exercise personal jurisdiction over a person, who acts directly <u>or by an agent</u>…."

The Complaint clearly alleges that Defendants transact significant business in the District of Columbia, and that Plaintiffs' injury were a direct and proximate result of Defendants' business in this judicial district. The Complaint alleges that *The Alex Jones Show* and *The War Room*, which are hosted by Defendants Alex Jones and Shroyer, respectively, are broadcast into this judicial district. Comp. ¶¶ 12-13. These include the broadcasts in which the tortious, defamatory, and malicious statements were made by Defendants.  Furthermore, the Complaint alleges that "Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nation-wide, including medicine, supplements, and "tchotchkes" with InfoWars branding." Comp. ¶ 15. The funds from sales of these goods are then used to influence and direct activity in this judicial district:

> The money earned from these sales funds the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in order to try to improperly influence the Mueller Russian collusion investigation and to coerce false testimony from Plaintiff Corsi favorable to Stone in his upcoming criminal prosecution. Comp. ¶ 15.

Defendants' impact and reach on this judicial district is enormous. Indeed, Defendants even

caused and influenced one of their listeners to shoot up a restaurant in the Washington D.C. area after propagating one of their wild and false conspiracies:

> Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory. Comp. ¶ 20.

Thus, it is clear that Defendants regularly transact substantial business in this judicial district, which satisfies the D.C. Long Arm Statute.

This is even more clear when considering the actions of Defendants' agent - Stone, a co-host on *The War Room* -  as provided for under the D.C. Long Arm Statute. It is clear that Stone regularly conducts business in the District of Columbia. In his indictment by Special Counsel Mueller and his team of prosecutors, which is attached to the Complaint as an exhibit and incorporated therein by reference, Stone is a "political consultant who worked for decades in U.S. politics and on U.S. political campaigns." Comp. Ex. 1 at 2. Stone was an "official on the U.S. presidential campaign of Donald J. Trump…until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election. *Id*.

The Complaint alleges that Defendants are working together in concert with Stone in order to illegally and improperly attempt to influence the result of Special Counsel Mueller's Russian collusion investigation and now prosecution, which is centered in this judicial district:

> Defendants and Stone's conspiracy to defame, smear, intimidate, tamper with and threaten Plaintiffs is calculated to improperly and illegally influence the Russian collusion investigation, for which Stone has already been criminally indicted and to coerce false testimony favorable to Stone at his upcoming prosecution. This illegal conduct is also maliciously intended to harm Plaintiffs' reputations and credibility as Stone fears that Dr. Corsi will testify truthfully if subpoenaed by Special Counsel Mueller at Stone's upcoming criminal prosecution. Comp. ¶ 31.

Thus, it is clear that this Court may properly exercise personal jurisdiction over Defendants pursuant to the D.C. Long Arm Statute

## 2.      Due Process Clause

In addition to complying with the D.C. Long Arm Statute, the exercise of personal jurisdiction over Defendants in this district comports with all necessary due process requirements. "Due process is satisfied if the defendant's 'minimum contacts' with the District are such that subjecting it to suit would not offend traditional notions of fair play and substantial justice. *Id*. at 18 (internal quotations and citations omitted). "Under the 'minimum contacts' standard, courts must insure that 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id*.

Importantly, the U.S. Supreme Court case of *Keeton v. Hustler, Inc*., 465 U.S. 770 (1984), the plaintiff was a resident of New York, who brought a defamation case in New Hampshire against the defendant magazine, which was an Ohio corporation. *Id*. at 772. The only connection that the defendant had to New Hampshire was that the magazine had circulation in New Hampshire. *Id*. The U.S. Supreme Court held that the publisher of a national magazine was subject to jurisdiction in every location in which it was circulated, even if "the bulk of the harm done to petitioner occurred outside [the forum]." *Id*. at 780. In addition, in *Keeton*, the only connection necessary that the publisher had to the forum state was the circulation and sale of the publication. It is indisputable that the defamatory statements were published in this judicial district. Exhibit 1 ¶ 10, thereby affording the Court personal jurisdiction in this case.

Furthermore, here, the Court has grounds to exercise both general and specific jurisdiction over Defendants. As set forth above, Defendants' daily broadcast into Washington D.C. and this creates the requisite "continuous and systematic" contacts with this judicial district

for general personal jurisdiction. *See Hourani v. PsyberSolutions LLC*, 164 F. Supp. 3d 128, 136 (D.D.C. 2016). As set forth in the preceding section, Defendants' regularly broadcast both *The Alex Jones Show* and *The War Room* into this judicial district, which has already led to extremely violent and deadly conduct in this judicial district. Defendants also "do substantial business and promote and sell various goods in this judicial district and nation-wide, including medicine, supplements, and "tchotchkes" with InfoWars branding." Comp. ¶ 15.

In the unlikely event that this Court finds no general jurisdiction, it is still abundantly clear that specific jurisdiction exists. A court has specific jurisdiction if (1) the defendant has "purposefully established minimum contacts" with the forum by "purposefully direct[ing]" his activities there and (2) the plaintiff's claims "arise out of or relate to" those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). As set forth above, Defendants tortious conduct is "purposefully directed" at the District of Columbia, in an effort to tamper with and interfere with Special Counsel Mueller's Russian collusion investigation and his indictment in the U.S. District Court for the District of Columbia. *See* Comp. ¶ 15, 31. Plaintiffs' injuries – i.e. being defamed, threatened, and discredited – all arise directly and proximately from Defendants attempts to illegally influence Special Counsel Mueller's investigation and his criminal prosecution , which is in this judicial district.

### B.      Venue is Proper in the District of Columbia

Under 28 U.S.C. §1391(b)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." The Complaint alleges that Defendants' tortious conduct was targeted at the District of Columbia, in an attempt to illegally influence and tamper with the ongoing Russian Collusion Investigation and now criminal prosecution, both of which

are centered and/or located in this judicial district. Put another way, a substantial part of the Defendants' tortious conduct involves his investigation and now prosecution in the District of Columbia by Special Counsel Mueller, since without the prosecution and Russian collusion investigation, there would be no need to defame, discredit, and threaten Plaintiffs. In addition, as Person 1 in the Mueller indictment, Plaintiff Corsi will likely be subpoenaed to testify in Stone's criminal trial in this district.

Furthermore, it is clear that he defamatory statements made by Defendants were broadcast into this judicial district by virtue of their availability on the internet. They were therefore widely projected into and thus available for viewing and consumption in his judicial district.

**C.       Defendants' Motion to Dismiss Under Rule 12(b)(6) Must Be Denied**

       **1.       Legal Standard**

Fed. R. Civ. P. 8(a)(2) states that a pleading need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." When reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the court must "accept the complaint's allegations as true and draw all reasonable inferences in favor of the non-moving party." *Gordon v. United States Capitol Police*, 778 F.3d 158, 163-164 (D.C. Cir. 2015).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (internal quotations omitted). As such, a motion to dismiss at this stage must be decided solely on what Plaintiffs have plead in their complaint, taken as true, and not upon any factual "contradictions" that Defendants have attempted to insert. Involving such

weighing of fact would take the standards of pleading to new heights not contemplated before by any Court.

When deciding on a motion to dismiss a claim for defamation, the Court "must assume, as the complaint alleges, the falsity of any express or implied factual statements made in the article." *Weyrich v. New Republic, Inc.,* 235 F.3d 617, 623 (D.C. Cir. 2001). It must also assume that the defamatory statements were made "with knowledge of their falsity or reckless disregard for their truth." Id. In situations where resolution is necessarily fact intensive, like defamation, the U.S. Supreme Court has held that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (U.S. 1935). As such, it is crucial and required that Plaintiffs be afforded the opportunity to conduct discovery and present its findings to the proper fact-finding body—the jury. In fact, courts have held that even in a summary judgment motion for defamation, taking the matter out of the jury's hands is almost always inappropriate, except in those rare cases where the circumstances surrounding the allegedly defamatory communication are completely undisputed. *See, e.g., Shaw v. R.J. Reynolds Tobacco Co.*, 818 F. Supp. 1539, 1541 (M.D. Fla. 1993), aff'd, 15 F.3d 1097 (11th Cir. 1994); *Abraham v. Baldwin*, 42 So. 591, 592 (Fla. 1906); *Glynn v. City of Kissimmee*, 393 So. 2d 774. 776 (Fla. 5th DCA 1980). This principle applies even stronger here, where Defendants have not yet entered any evidence on his behalf and where a simple Rule 12(b)(6) motion is at bar. Plaintiffs must, at a minimum, be permitted to conduct discovery.

### 2. Plaintiffs Properly Pled Claims for Defamation, Defamation by Implication, and Defamation Per Se

Under District of Columbia law, a valid defamation claim must plead only four elements:

> [T]he defendant made a false and defamatory statement concerning the plaintiff";
> (2) the defendant published the statement without privilege to a third party; (3) the
> defendant's fault in publishing the statement amounted to at least negligence; and
> (4) either the statement was actionable as a matter of law irrespective of special
> harm, or its publication caused the plaintiff special harm.

*Devincci Salah Hourani v. Mirtchev*, 796 F.3d 1, 16 (D.C Cir 2015) (internal quotations omitted). Defamation is . . . that which tends to injure "reputation" in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him. *Guilford Transp. Indus. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000). Importantly, statements that are purported to be "opinion" may be nonetheless actionable as long as they have "an explicit or implicit factual foundation and is therefore objectively verifiable." *Id*. at *597* (internal quotation omitted). "[S]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016) "Whether a defamatory statement of opinion is actionable often depends on the context of the statement in question. *Id*. "If, for example, an average reader would likely understand that particular words, in the context of an entire article, were not meant to imply factual data but, rather, were intended merely to disagree strongly with the views of the [plaintiff], those words would be protected despite their factual content." *Id*.

As a threshold matter, the Complaint clearly alleges that each and every Defendant is working together in concert to maliciously defame, discredit, and smear Plaintiffs. Comp. ¶ 22. This renders each and every Defendant jointly and severally liable for the tortious conduct of their co-conspirators. "[L]iability for civil conspiracy depends on performance of some underlying tortious act"; "[civil] conspiracy is not independently actionable; rather it is a means for establishing vicarious liability or the underlying tort." *Saucier v. Countrywide Home Loans*,

64 A.3d 428, 446 (D.C. 2013). Defendant Shroyer is also directly liable for the false and defamatory statements made on his own show, *The War Room*, as Stone made the false and defamatory statements in the context of a conversation with Defendant Shroyer which Shroyer the adopted and ampflied. Thus, at a minimum, these statements were approved and/or ratified by Defendant Shroyer. Comp. ¶¶ 48 – 64. Furthermore, "if a corporation under the doctrine of respondeat superior is responsible for the willfully slanderous utterances of its employee while acting for it within the scope of his employment, a joint action may be maintained against both the corporation and the employe by the injured party." *Aetna Life Ins. Co. v. Brewer*, 12 F.2d 818, 820 (D.C. Cir. 1926). It is clear that both Defendants Alex Jones and Shroyer - as well as Stone, who is Defendant Shroyer's co-host on *The War Room* - were acting within the scope of their employment, (broadcasting their respective radio shows for Defendant Infowars) which means that the corporate entities, Infowars, LLC and Free Speech Systems, LLC are properly included in this lawsuit.

### a.    Plaintiffs Are Not Public Figures

From the outset, it is abundantly clear that neither Plaintiff are general purpose public figures. In order to qualify under this standard, "[a]n individual may have attained a position of such persuasive power and influence," id., and of "such pervasive fame or notoriety, that he has become a public figure in all situations. This test is a strict one. The Court stated flatly that (a)bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Waldbaum v. Fairchild Publ'ns*, 201 U.S. App. D.C. 301, 627 F.2d 1287, 1292 (1980) (internal quotations and citations omitted). It is clear from this incredibly high standard that neither of Plaintiffs are general purpose public figures. Thus, the only remaining

possibility is the limited-purpose public figure.

A limited-purpose public figure is "an individual (who) voluntarily injects himself or is drawn into a particular public controversy and therefore becomes a public figure for a limited range of issues." *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1292 (1980) (internal citation and quotation omitted). "The relevant examination turns on 'the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" *Id*. The *Waldbaum* Court set forth three elements to determine whether a person is a limited public figure: (1) the existence of a public controversy, (2) whether a reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy and (3) whether the alleged defamation related to that controversy. *Id*. at 1298. If the Court determines that the Plaintiff is a limited purpose public figure, the Plaintiff must show that the Defendant acted with actual malice in order to sustain a cause of action for defamation. If is clear that neither of the Plaintiffs are limited purpose public figures,

Defendants' only real argument that Plaintiff Klayman is a "public figure" based on the findings of different Courts that Plaintiff had been a public figure for the purposes of those litigations. *See Klayman v. Judicial Watch, Inc*., 22 F. Supp. 3d 1240 (S.D. Fla. 2014); *Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 112 (D.D.C. 2009). However, it is clear that the analysis as to whether a specific Plaintiff is a limited purpose public figure is context specific. As such, findings by previous courts in different contexts that Plaintiff Klayman was a limited purpose public figure are entirely irrelevant to the current context and situation.

Here, neither of the Plaintiffs voluntarily injected himself into the purported "public controversy." Their involvement was not by choice, but instead forced by Defendants and Special Counsel Mueller and his staff, who named Plaintiff Corsi as a witness on Stone's

indictment. Plaintiff Corsi was then forced to retain counsel, Plaintiff Klayman, and make public statements in order to protect his own reputation as an investigative journalist. Put another way, Plaintiffs never sought out any of the media attention, but were involuntarily brought into the controversy and forced to defend themselves once Defendants began maliciously defaming them. Furthermore, it is abundantly clear that Defendants' false, malicious, and misleading statements essentially, such as by way of just one example, calling Plaintiff Corsi an alcoholic are not germane in any way to the Russian collusion investigation and prosecution, and were made by Defendants solely to discredit Plaintiff Corsi and tarnish his reputation in this district. Comp. ¶¶ 42 – 47. The same holds true for the false and defamatory allegations that Plaintiff Klayman had been "ousted" from Judicial Watch because of a "sexual harassment complaint."  Comp. ¶ 57.

### b.     Plaintiffs' Defamation Allegations Are Properly Pled

As set forth above, neither Plaintiff Klayman nor Plaintiff Corsi are public figures for the purposes of this litigation, rendering a showing of malice unnecessary. However, even in the unlikely event that this Court finds that one or both of the Plaintiffs are limited-public figures, it is clear that Defendants acted with malice. "[A] public-official or public-figure plaintiff must demonstrate that a publisher either actually knew that a published statement was false, or recklessly disregarded whether it might be false." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 112 (D.C. Cir. 2017).  From the very outset, it is clear that Plaintiffs specifically pled that each of the false and defamatory statements were made by Defendants <u>with malice</u> and actual knowledge of their falsity. At this point in the case, these allegations are enough and this case must, at a minimum, proceed to discovery.

///

### i.        The October 26, 2018 Video

Defendants' primary defense appears to be trying to couch their false, malicious, and defamatory statements of fact as opinion. However, it is clear that "statements that are purported to be "opinion" may be nonetheless actionable as long as they have "an explicit or implicit factual foundation and is therefore objectively verifiable." *Guilford*, 760 A.2d at *597* (internal quotation omitted). Indeed, this makes perfect sense. Otherwise, a tortfeasor would be given free reign to defame any other person simply be using the word "seems" in the defamatory publication.

The first statement at issue appears in paragraph 43 of the Complaint, where Defendant Alex Jones stated that Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Despite Defendants' attempts to argue opinion, based solely on the inclusion of the word "seemed," it is clear that the defamatory statement provides an objectively verifiable statement of fact. Whether a person is "mentally degraded" is a medical question of fact. One either is, or is not. Defendant Alex Jones takes it a step further, making a diagnosis of "dementia." Again, this is a objective medical diagnosis that is a statement of fact. One either has dementia or he doesn't. Plaintiff Corsi is neither "mentally degraded" not does he have "dementia." Thus, the statements of "fact" spewed by Defendant Alex Jones are objectively and provably false. These statements were made simply to discredit Plaintiff Corsi as a witness in Stone's indictment and prosecution. Lastly, this false statement was based on a supposed first hand account, so Defendant Alex Jones must know the truth or falsity of his statement. Thus, if false, it is clear that he acted with malice.

The second statement at issue appears in paragraph 44 of the Complaint, where "Defendant Alex Jones, acting in concert with the other Defendants, maliciously fabricates a

story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator."  These are two statements of objectively verifiable fact. Either Plaintiff Corsi collapsed or he didn't, and either his security staff thought he "was dead in the elevator" or they didn't. It is especially important that these statements were made in the context of Defendant Alex Jones clearly trying to discredit Plaintiff Corsi, as he immediately tries to defend Stone in the context of Mueller's investigation and prosecution immediately afterwards. Indeed, a person that simply passes out on the ground at a restaurant would not be a reputable source of information, as he would be seen as feeble, weak, and therefore not in the state of mind to be able to tell the truth. This is exacerbated by the lie compounded by Alex Jones that his security staff thought Plaintiff Corsi was "dead in the elevator." Again, this statement of false objectively verifiably fact only seeks to further discredit Plaintiff Corsi's credibility. Lastly, this false statement was based on a supposed first hand account, so Defendant Alex Jones must know the truth or falsity of his statement. Thus, if false, it is clear that he acted with malice.

The third statement at issue appears in paragraph 45 of the Complaint, where "after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." This is textbook defamation, especially in the context of Defendant Alex Jones' previous attempts to cast Plaintiff Corsi as a liar or, at a minimum, someone mentally incapable of telling the truth. As set forth above, falsely accusing someone of having suffered a stroke is not only reprehensible, but it is also stating a false, objectively verifiable fact. Defendants likely recognize this and put forth the weak assertion that Defendant Alex Jones "did not call Dr. Corsi an intentional liar." Def's Mtn. at 17. This is a distinction without a difference. The bottom line is that Defendant Jones has publicly broadcasted that

Plaintiff Corsi is a liar who cannot be trusted. This clearly and unequivocally "tends to injure "reputation" in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him. *Guilford,* 760 A.2d at 594. This is especially true given Plaintiff Corsi's profession as an investigative journalist. An investigative journalist with a reputation for lying is no longer an investigative journalist.

Lastly, it is clear that this was no "hyperbole" or "diatribe" that was a mere "expression of outrage." From the context of the entire broadcast, as conveniently set forth by Defendants themselves, ECF No. 7 Ex. 1, this was a carefully calculated segment to try to discredit Plaintiff Corsi and smear his reputation to the benefit of their co-conspirator, Stone. Defendant Jones gave specific, albeit false and fabricated, instances of Plaintiff Corsi's mental health supposedly being compromised, all leading up the payoff that "whatever comes out of his mouth ain't the truth." There is no opinion, no hyperbole, and no rhetoric. These are fabricated facts.

### ii.    The January 18, 2019 Video

The January 18, 2019 video contains numerous false, malicious, and defamatory statements made by Stone on Defendant Shroyer's *The War Room*, which is filmed and broadcasted by and on behalf of Defendant Infowars. Thus, Defendant Infowars gave Stone the platform to maliciously defame and discredit Plaintiffs in furtherance of the conspiracy between Defendants and Stone to try to illegally influence and tamper with Mueller's Russian collusion investigation and now prosecution while seeking financial gain.

While the false and defamatory statements contained in this video range from paragraphs 50 – 64 of the Complaint, Defendants offer up no actual defense to any of them, except for paragraph 57 of the Complaint, other than a half-hearted assertion of "opinion" and "hyperbole."

Since Defendants make no showing of how these statements are supposedly "opinion" or "hyperbole"- nor could they - these unaddressed statements of fact should be treated as conceded to be defamatory. Indeed, as just one example, at "2:09 in the January 18 Video, Stone maliciously and falsely published that Plaintiff Corsi was "fired from World Net Daily." Comp. ¶ 50. This is purely a question of fact. Other defamatory publications concerning Plaintiff Klayman which are left unaddressed and are therefore conceded as well:

> At 1:25 in the January 18 Video, Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life." Comp. ¶ 56.

> At 1:37 in the January 18 Video, Stone maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong. Comp. ¶ 60.

> At 2:01 in the January 18 Video, Stone maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage." Comp. ¶ 62.

> At 4:11 in the January 18 Video, Stone maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…" Comp. ¶ 63.

Not only do Defendants not address these false, malicious, and defamatory statements in their Motion to Dismiss, Plaintiff Klayman also attaches hereto an affidavit that conclusively demonstrates the falsity of these statements. Exhibit 2.

Defendants' sole argument pertains to paragraph 57, which states that "At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" In their defense, Defendants cite a paragraph from Klayman v. Judicial Watch, Inc., 247 F.R.D. 10, 12-13 (D.D.C. 2007) which read:

> Judicial Watch alleges that in May 2003, Klayman informed Fitton and Orfanedes that his wife, a former Judicial Watch employee, had

commenced divorce proceedings against him and that she alleged that Klayman had had an inappropriate relationship with a Judicial Watch employee with whom he had been in love and that Klayman had assaulted her physically.  According to Judicial Watch, Klayman denied having a sexual relationship with the employee but acknowledged that he had been in love with the employee, that he had purchased gifts for the employee and had kissed her, and also acknowledged an incident with his wife that clearly provided the basis for his wife's allegation of physical assault. Judicial Watch alleges that Fitton and Orfanedes considered Klayman's acknowledged behavior entirely inconsistent with that of a leader of a conservative, pro-family organization, as well as Klayman's fiduciary duties to the organization, and that they were concerned about Klayman's possible misuse of Judicial Watch resources.  Judicial Watch further alleges that, as a result of these revelations, Fitton requested that Klayman resign, and Fitton and Orfanedes also insisted that Judicial Watch undertake an internal investigation into Klayman's conduct, including an audit.  According to Judicial Watch, Klayman offered to resign rather than face such an inquiry, and the parties began negotiating for his separation from Judicial Watch, which eventually culminated in the September 19, 2003 Severance Agreement.

Absolutely nothing contained in this excerpt, which has not been proven in any event, supports the factual finding that Plaintiff Klayman was "ousted" from Judicial Watch due to a "sexual harassment complaint." Indeed, plain language of the excerpt clearly states that Plaintiff Klayman "offered to resign" in order to run for U.S. Senate in Florida. *See* Exhibit 3, *Severance Agreement*. This is not being "ousted." Furthermore, the unfounded "sexual harassment complaint" allegation appears to be based solely on allegations from Plaintiff Klayman's ex-wife as grounds for divorce, which Plaintiff Klayman denied, and which the ex-wife later retracted. "Klayman denied having a sexual relationship with the employee but acknowledged that he had been in love with the employee…." *Id*. This is not sexual harassment. Stone had no basis to make these false, malicious, and defamatory claims.

Importantly, there is not showing that Defendants were even aware of the

allegations when they defamed Klayman, notwithstanding their falsity.

### iii.   Other Defamatory Publications

While the false and defamatory statements contained in this section range from paragraphs 65 – 70 of the Complaint, Defendants only address paragraphs 68 and 69. Thus, the rest must be treated as conceded.

"Defendant Alex Jones maliciously and falsely accuses Plaintiff Corsi of being a 'spook, back and forth with different agencies,' falsely saying that Dr. Corsi had worked with different government agencies." Comp. ¶ 68. The defamatory nature of this false statement of fact is apparent when considering the context in which it was made. This statement was made to advance the false notion that Plaintiff Corsi was cooperating with Special Counsel Mueller to try to take down Stone, and by extension, President Trump. By publishing the false statement that Plaintiff Corsi is now working with Mueller to take down Trump, Defendants has severely harmed Plaintiff Corsi professional image and reputation. This has negatively impacted Plaintiff Corsi's ability to garner support in the conservative community. Falsely accusing Plaintiff Corsi of working with Mueller to take down President Trump is tantamount to an accusation of "treason" in the conservative community. Indeed, conservatives who support Trump and believed Defendants' false statements would understandably be turned off to Plaintiff Corsi's work.

"Lastly, Defendant Alex Jones further maliciously falsely accuses Plaintiff Corsi of sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic." Comp. ¶ 69. There is no possible "context" where this is not defamatory. Merely falsely asserting that at some point, Plaintiff Corsi had been, or continues to be unable to even walk, especially when trying to accuse Plaintiff Corsi of alcoholism, clearly "tends to injure

"reputation" in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him. *Guilford,* 760 A.2d at 594.

### 3.    Intentional Infliction of Emotional Distress

"To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013). Courts have held that a single threat of physical harm or death can sustain a claim for intentional infliction of emotional distress. "With the possible exceptions of the bomb and death threats, no single action…rises to the level of intentional infliction of emotional distress." *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 82 (Tex. App. El Paso 1998). *See also Homan v. Goyal,* 711 A.2d 812 (D.C. 1998) (finding the requisite outrageous behavior based largely on the presence of death threats).

Here, Defendants' co-conspirator Stone directly threatens Plaintiff Corsi, after maliciously defaming him, saying "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives…. *__I look forward to our confrontation. I will demolish you__*. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Comp. ¶ 67. (emphasis added). This is a direct, credible threat to Plaintiff Corsi's life and the lives of those around him, including Plaintiff Klayman, who has been representing him with regard to both Defendants' defamation, but also Mueller's investigation.

//

4.      **Assault**

In order to sustain a claim for assault, a Plaintiff need only plead in the District of Columbia, "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Dingle v. District of Columbia*, 571 F.Supp.2d 87, 98 (D.D.C. 2008). Plaintiff Corsi has more than fulfilled this requirement.

As set forth in the previous section, Defendant's co-conspirator, Stone made direct threats to Plaintiff Corsi's life, saying "**I look forward to our confrontation. I will demolish you**." Comp. ¶ 67. These threats are more than credible, as Stone also threatened to kill Randy Credico and his service dog. Comp. ¶ 67. Like Plaintiff Corsi, Mr. Credico was named as Person 2 in Stone's indictment. Plaintiff Corsi was named as Person 1 as a material witness to Stone's crimes. Even more, as set forth previously, Stone went so far as to publicly threaten the life of the judge assigned to his criminal case, Judge Amy Berman Jackson, which caused her to issue a total gag order, for which this Court can take judicial notice. These types of threats are what Stone, who fashions himself as Mafia,  are known for:

> Stone likes to portray himself as Mafia, frequently making reference to
> Mafia figures who he admires, as well as other unsavory types who have been
> alleged to have engaged in unethical and/or illegal behavior. He frequently makes
> reference to his heroes being Hyman Roth in the 'Godfather," who was the movie
> version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his
> role in Watergate. In this regard, after Stone was indicted he held a press
> conference on the courthouse steps of the federal courthouse in Ft. Lauderdale,
> where he was booked, with his arms defiantly in the air in the "victory' pose used
> by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the
> time, Stone had been employed by a Nixon group called CREEP, or the
> Committee to Reelect the President. Stone even has a large tattoo of Richard
> Nixon affixed to his back. Thus, given his admiration for persons such as these,
> particularly Mafia figures, his actions as pled herein can be taken as threats, as
> well as being defamatory. And, Plaintiff Corsi is 72 years old. Stone's intentional
> infliction of emotional distress and coercion and threats are intended to try even
> cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will
> be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a
> material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia

style." Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix. Comp. ¶ 29.

### 5.      Lanham Act Unfair Competition

Defendants falsely assert that Plaintiffs' claim under the Lanham Act for Unfair Competition must fail because there is no "commercial" speech at issue. However, it is clear that at all times, Defendant had a strong economic motivation for distributing the material at issue. *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) quoting *Bolger*, 463 U.S. at 66-67. The Complaint alleges that "Defendants, acting in concert, as part of their latest scheme for notoriety, fame, **and profit**, are now working in concert with Stone to defame, intimidate, and threaten Plaintiffs." Comp. ¶ 22 (emphasis added). Indeed, the Complaint sets forth the fact that "Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere." Comp. ¶ 71. Thus, by discrediting and defaming Plaintiffs, Defendants are trying to "materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation." Comp. ¶ 74. Thus, in essence, the motivation behind Defendants' defamation is greatly financial, as they seek to destroy Plaintiffs reputation in order to eliminate them as competition.

Indeed, the Complaint clearly alleges that Plaintiffs are both "competitors' to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere. Comp. ¶ 71. For instance, Plaintiff Klayman "hosts an online radio show and produces videos that are posted on the internet, issues press releases, commentary and other publications." Crucially, Defendants have engaged in unfair competition, under the ambit of the

Lanham Act because they have "made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiffs during their various programs and media postings and publication, which all contain significant advertisement or promotions." Comp. ¶ 73. As a result, Plaintiffs have suffered severe harm, as "These false and/or misleading (published) facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation." Comp. ¶ 74.

## III.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully requests that this Court deny Defendants' Motion to Dismiss. Plaintiffs also respectfully requests that this Court sua sponte award counsel for Defendants pursuant to its inherent authority for filing this patently frivolous Motion to Dismiss, which he has had to expend great time and expense to oppose. *Bruce v. Potomac Elec. Power Co.*, 162 A.3d 177, 186 (D.C. 2017). *See also In re M.L.P.*, 936 A.2d 316, 322 (D.C. 2007) ("[T]he court also has inherent authority to award attorneys fees and costs upon a showing of bad faith"), which like much of what Defendants are regrettably known for, is present here. *See also* supra footnote 1 regarding counsel for Defendants, Marc Randazza.

Dated: May 13, 2019                                     Respectfully Submitted,

                                                        *    /s/ Larry Klayman    *
                                                        Larry Klayman, Esq.
                                                        KLAYMAN LAW GROUP, P.A.
                                                        D.C.  Bar Number: 334581
                                                        2020 Pennsylvania Ave NW #800
                                                        Washington, DC, 20006
                                                        Telephone:  (310)-595-0800
                                                        Email: leklayman@gmail.com

                                                        *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on May 13, 2019

/s/ Larry Klayman
Larry Klayman, Esq





Ad

AdChoices ▷

**POLITICS**   03/20/2019 02:00 pm ET

# Connecticut Judge: Attorney Marc Randazza Is Too Unethical To Represent Alex Jones

The lawyer-to-the-trolls got booted from a Sandy Hook defamation case against the Infowars host.

By Luke O'Brien



HUFFPOST

Lawyer Marc Randazza regularly appears on Alex Jones' Infowars. But he will not be appearing in court to represent Jones.

Alex Jones needed an "untainted" lawyer. That's why he fired Marc Randazza this month.

The far-right conspiracy theorist had had a brief professional relationship with the attorney-to-the-trolls. Last spring, Jones, who falsely claimed that the Sandy Hook massacre was a hoax, hired Randazza after being sued in



Connecticut Judge: Attorney Marc Randazza Is Too Unethical ...    390     

But Randazza, a regular guest on Jones' conspiracy outlet Infowars, came with baggage.

In January, the attorney filed what's called a pro hac vice application to be added to the Sandy Hook case as an out-of-state lawyer. Judges routinely sign off on these applications. The Connecticut judge, however, swiftly rejected Randazza's application, citing "serious misconduct" by the attorney.

"Permission to appear pro hac vice is a privilege, not a right," the judge wrote, ending Randazza's aspirations to take the stage in one of the highest-profile First Amendment cases in the country.

The ruling was a humiliating setback for a lawyer who styles himself as a top free speech attorney. So was getting canned by his marquee client. Jones declared that he had no option, given the rejection of Randazza's pro hac vice application, but to "choose new counsel untainted by the claims of misconduct."

Claims? There was nothing suggestive about Randazza's misconduct. It happened. And his ethical problems had been on display for almost a decade, flaring into view only a few years after he began his legal career as a copyright enforcer for pornographers.

In 2009, he'd taken a job as in-house counsel for a group of porn companies known as Excelsior/Liberty. But he sold out his employer for side money, according to an arbitrator's ruling. After getting caught, Randazza waged lawfare against Excelsior/Liberty for years. The dispute only exposed him as a scoundrel. In 2015, he lost decisively in arbitration, then declared bankruptcy to avoid paying $600,000 in damages.

By then, he'd reinvented himself as an attorney for racists, fascists, rape advocates, propagandists and extremists. He soon became America's go-to attorney for far-right undesirables who use defamation, harassment and threats to silence others. Some of his current clients include neo-Nazi publisher Andrew Anglin, Holocaust-denying slanderer Chuck Johnson and Pizzagate peddler Mike Cernovich, who is also Randazza's close friend and business partner. Another Randazza friend and — according to him — former client is the porn actress and right-wing Gamergate troll Mercedes Carrera, who was charged in February with eight counts of sexually abusing a minor under the age of 10. (Carrera has pleaded not guilty.)

Randazza's brush-off in Connecticut, however, had nothing to do with the sordid company he keeps. It had to do with his ethical problems.

In December, HuffPost published an exposé of Randazza's violations of the rules of professional conduct that govern attorney behavior. He'd made scores of misrepresentations in court, entered into conflicts of interest and solicited bribes.

"There needs to be a little gravy for me," he once wrote opposing counsel while seeking extra lucre. "I'm gonna want at least used BMW money."

    Connecticut Judge: Attorney Marc Randazza Is Too Unethical ...    390     

---

> In order to conflict me out of future matters, I suggest this:
>
> Your firm retains me as "of counsel" to you. I'd get $5K per month (for six months) paid to me, from you (TNA will reimburse you, I presume). I will render advice on TNA and TNA only, and I'll be chinese walled from your other clients so that other conflicts are not created.

An email from far-right attorney Marc Randazza seeking a payoff from a porn company. View the full document here.

---

For years, Randazza had avoided scrutiny for his wrongdoing, mainly because the legal profession does such a poor job policing its own. Eventually, the State Bar of Nevada, which licenses Randazza, launched an investigation. (He is also licensed in Arizona, California, Florida and Massachusetts.) Randazza pleaded guilty to two ethical violations. The first concerned a shady loan he'd made; the second, a bribe he'd solicited from Oron, a file-sharing company he sued while working for Excelsior/Liberty.

But the Nevada Bar found "mitigating circumstances" to reduce Randazza's punishment. In October, he walked away with a 12-month stayed suspension and an 18-month probation. He kept right on lawyering.

He also continued to fudge facts. And his offenses may finally be catching up to him.

## Legacy of Lies

Randazza started his job at Excelsior/Liberty in 2009. But he was soon secretly lawyering for Excelsior/Liberty competitors such as Bang Bros, Titan Media and Kink.com. These were glaring conflicts of interest. Randazza also worked for companies accused of infringing Excelsior/Liberty's copyrights. One was XVideos, a porn site that Excelsior/Liberty wanted Randazza, then their in-house counsel, to sue for infringement. Instead, Randazza started billing XVideos every month, a fact he concealed from Excelsior/Liberty while dissuading his employer from pursuing litigation. Randazza invoiced XVideos for over $44,000 during this period.

Randazza also made misrepresentations about his role at Excelsior/Liberty. In court filings, he often concealed his salaried job and claimed that Excelsior/Liberty had "incurred" his fees, which allowed him to recoup more money from litigation targets. Over time, his behavior grew more brazen. He used ill-gotten privileged legal communications that might have come from a hacker to gain an advantage in one proceeding. In others, he began soliciting payoffs from litigation targets to "conflict himself out" from being able to sue them again.

In 2012, his boss at Excelsior/Liberty caught Randazza trying to sneak one of these bribes into a settlement agreement. Their relationship ended. Randazza filed a trumped-up discrimination claim, alleging he'd been sexually harassed as a straight man working at a gay porn company. He sued Excelsior/Liberty. Then he initiated an arbitration dispute. Excelsior/Liberty, meanwhile, filed bar complaints against Randazza everywhere he was licensed.

In 2013, Randazza lied to the bar associations in Nevada and Florida about not representing XVideos. The Nevada Bar, which was the lead regulatory body, did nothing and declined to investigate any of Excelsior/Liberty's other allegations, citing pending litigation. The bar complaints in other jurisdictions were subsequently closed.

But the arbitration forced Randazza to produce financial records and admit under oath that he'd been working for XVideos all along, among other unethical things. In 2015, the arbitrator ruled against Randazza on numerous points and determined that the attorney had solicited a $75,000 bribe from Oron. Randazza filed for bankruptcy to avoid paying damages to Excelsior/Liberty. His former employer lodged another round of bar complaints based on the arbitrator's decision and voluminous evidence from the arbitration.

The Nevada Bar accepted his plea last year and recommended a light punishment, which the Nevada Supreme Court approved in October 2018.

The Nevada discipline has now prompted "reciprocal" disciplinary proceedings in the other jurisdictions that license Randazza. Those bar associations will decide whether to impose similar discipline for Randazza's admitted ethical violations or to increase or reduce his punishment.

Below, a roundup of Randazza's latest problems and prevarications across the country.



HUFFPOST

Randazza bones up on the law.

## Connecticut

    
attached to Randazza's pro hac vice application in the Sandy Hook case. In it, Randazza acknowledged the reciprocal disciplinary proceedings against him but told the court that he was "aware of no other grievances."

But he had known for weeks about a new Excelsior/Liberty-related complaint against him, this one filed in Arizona in October by a different party.

When HuffPost asked Randazza about the omission in his affidavit, he claimed the complaint wasn't a "grievance" because Arizona uses different terms. He called it a "screening" and said he felt no need to report it since it was a refiling of documents from the Excelsior/Liberty dispute, which was true. A few days later, he told the Connecticut court that the new complaint dealt with the "same set of operative facts as the underlying discipline in Nevada." That, though, was misleading. The complaint covers alleged violations that the Nevada Bar failed to address — for example, Randazza's request for "used BMW money."

In response to Randazza's application to represent Jones, the Sandy Hook plaintiffs had also filed a memorandum that included the 2015 arbitration ruling against Randazza. Emails produced during the arbitration show that Randazza solicited a payoff to prevent him from suing Oron in the future, a clear violation of an ethical rule that prohibits a lawyer from offering or making an agreement that restricts his right to practice.

In court, Randazza dismissed the memorandum as "an effort to smear" him and called the bribe a "mischaracterization." Randazza also told the court that his discussions with Oron about paying him "were fully disclosed" to Excelsior/Liberty. But this, too, had been shot down during the arbitration.

"That's a flat-out lie, and he knows it," said Brian Dunlap, the vice president of Excelsior. "He could never produce any emails when he disclosed it. He could never recall any specific dates when he did. He could never back it up at all. And his story kept changing."

RELATED...



**Alex Jones' Lawyer Violated Legal Ethics By Soliciting Porn Bribes. Just How Dirty Is Marc Randazza?**



**Andrew Anglin's Lawyer Visited The Elusive Nazi's Hometown And Madness Ensued**



**American Neo-Nazi Is Using Holocaust Denial As A Legal Defense**



**Alex Jones Hires High-Profile Free-Speech Lawyer In Sandy Hook Lawsuit**

## Arizona

In response to the Nevada Supreme Court order disciplining Randazza, the Arizona Bar in January gave Randazza 18 months of probation and a formal reprimand for his "failure to avoid conflicts of interest with clients" and his failure to act ethically in extending a loan to a client.

A separate Arizona ethics complaint was filed against Randazza on Oct. 12, 2018, by Tom Retzlaff, who has tangled in court with far-right extremists such as Jason Lee Van Dyke, a Texas lawyer and ostensibly a former member of the Proud Boys gang. Van Dyke has worked closely with Randazza in the past and was recently suspended from practicing law in Texas for three months for threatening to kill Retzlaff.



Connecticut Judge: Attorney Marc Randazza Is Too Unethical ...  390  

into a wider range of scurrilous activity than Nevada did, including Randazza's relationship with XVideos, the alleged copyright infringer that Randazza was secretly representing.

And Randazza now appears to be lying about XVideos to the Arizona Bar. In January, he assured the bar that he'd told Excelsior/Liberty "in writing" about his representation of XVideos and that he let his employer know he couldn't represent Excelsior/Liberty against XVideos because of a potential conflict.

## Subscribe to the Politics email.

How will Trump's administration impact you?

address@email.com                    SUBSCRIBE



State Bar of Arizona
January 14, 2019
Page 9

### 1.    XVideos

During the course of his Excelsior employment, Mr. Randazza provided some counsel to XVideos, a pornographic "tube site". A "tube site," like YouTube, does not directly infringe or even create content. Rather, third parties upload videos to share with others. They are not liable to copyright holders unless and until they fail to abide a properly issued takedown notice under the Digital Millennium Copyright Act, 17 U.S.C. § 512.

Excelsior and Liberty knew Mr. Randazza represented XVideos. He told them. On January 17, 2011, an Excelsior and Liberty employee suggested pursuing XVideos itself for infringement. In response, Mr. Randazza reminded Excelsior and Liberty (in writing) that he and his law partner provided advice and counsel to XVideos in avoiding such infringement claims. He said he could not represent Excelsior and Liberty against XVideos, thus avoiding any conflict.

TOM RETZLAFF

Randazza's response to the Arizona Bar. View the full document here.

Randazza did not attach any proof of his XVideos disclosure to his response and refused to show the disclosure to HuffPost, citing attorney-client privilege.

"For him to say there was any disclosure or that clients were aware at all is obviously just bullshit," Dunlap said. "If that were the case, why would he deny [working for XVideos] initially to the Florida and Nevada bars in 2013?"

Randazza's claims to Arizona contradict what the Nevada Bar found in 2016, when it charged him with failing to disclose the XVideos conflict, hiding it from his employer and never getting "informed consent, confirmed in writing ... to represent XVideos." (The Nevada Bar did not pursue this alleged ethical violation.)

Randazza's Arizona response also clashed with his sworn arbitration testimony, when Randazza explicitly said he never made any written disclosure to Excelsior/Liberty about XVideos being his client nor obtained written consent



☰  █  Connecticut Judge: Attorney Marc Randazza Is Too Unethical ...    390    🔖  f  🐦  ✉  



UNITED STATES GOVERNMENT

Randazza's testimony at an arbitration hearing in 2015. View the full document here.

## California

Randazza will likely face reciprocal discipline in California for his Excelsior/Liberty transgressions. And Randazza made what appear to be dozens of misrepresentations in California federal court about his fees. He also solicited payments from TNA and Megaupload, two other Excelsior/Liberty litigation targets, to conflict himself out of future lawsuits, according to evidence produced during arbitration. As in other jurisdictions, it is an ethical violation in California for an attorney to "be a party to or participate in offering or making an agreement" to restrict his right to practice.

Retzlaff filed a bar complaint against Randazza in California on Nov. 22, 2018, he said.

## Florida

A reciprocal discipline action against Randazza is underway in Florida, which has looked past Randazza's dishonesty before. In 2013, Randazza told The Florida Bar that he didn't work for XVideos. Randazza's lawyer at the time, Brian Tannebaum, made the false statement in a letter he sent to the Bar.

Randazza told HuffPost that he insisted the letter be corrected as soon as he realized it contained an error and that Tannebaum was "entitled to get a detail wrong." Randazza said he told Tannebaum to send a new letter to the bar.

But it's unclear when Tannebaum did this, if at all. (Tannebaum refused to tell HuffPost if he had sent another letter.) And the timing Randazza cited was curious. His XVideos misrepresentation came to light during the arbitration in 2015. In September of last year, HuffPost showed Tannebaum the portion of the arbitration hearing where Randazza admitted to working for XVideos. Tannebaum, who no longer represents Randazza, said it was a document he'd never seen before.

"I did not participate in the arbitration," he said.

After speaking with HuffPost in September, Tannebaum said he contacted The Florida Bar in an effort to correct the XVideos misrepresentation. But this would have been at least three years after Randazza became aware of the problem.

## Massachusetts

≡   ▌   Connecticut Judge: Attorney Marc Randazza Is Too Unethical ...   390   🔖   f   🐦   ✉   ⬤

clients to suffer any actual harm or financial losses." That statement clashes with the ruling of the arbitrator, who determined that Randazza pilfered a $60,000 settlement from Excelsior/Liberty and violated the terms of another settlement, forcing his employer to pay back half of a $550,000 award.

In a reciprocal proceeding in Massachusetts Supreme Judicial Court, the Massachusetts Board of Bar Overseers, which licenses Randazza, is closely scrutinizing his Excelsior/Liberty misconduct. According to Dunlap, the board hopes to convince a judge that the Nevada Bar didn't do enough to rein in Randazza, who has continued to make misrepresentations.

In his response to the board, for example, Randazza declared that he "did not participate in the offering or making of an agreement to explicitly restrict his practice," which would be a violation of the rules of professional conduct.

company. Respondent's conduct was materially different from the *Traficonte* conduct.

Respondent did not participate in the offering or making of an agreement to explicitly restrict his practice—no covenant akin to the one agreed to by Mr. Traficonte is at issue. To the contrary, Mr. Randazza did that which the Rule is *intended* to promote—permitting Oron to freely choose Mr. Randazza as its counsel – for the *bona fide* provision of services, only after all matters with his employer's sister entity were resolved.

Prohibiting an attorney from discussing post-settlement *bona fide* services to

UNITED STATES GOVERNMENT

Randazza's reply to the Massachusetts Board of Bar Overseers. View the full document here.

But arbitration evidence and his own testimony showed that Randazza discussed payments from several companies to restrict his practice. His own guilty plea in Nevada includes an admission that he "offered to enter into an agreement [with Oron] which would have the likely effect of restricting Respondent's right to practice law."


25 | of a client controversy."  As part of the negotiations culminating in the drafting of the proposed

**SBN EXH 1, PG.0005**

---

1 | Post-Judgment Agreement to which Liberty was a proposed party and signatory, Respondent
2 | offered to enter into an agreement which would have the likely effect of restricting Respondent's
3 | right to practice law.

NEVADA SUPREME COURT

Randazza's guilty plea in Nevada. View the full document here.

Randazza also told the Massachusetts Supreme Judicial Court that he'd never made an offer to "never sue" Oron again.

> Additionally, the defendant in that litigation insisted that Mr. Randazza agree to never sue them again, as a condition of paying Mr. Randazza's employer $550,000.  Mr. Randazza never agreed to such a condition or made such an offer.

UNITED STATES GOVERNMENT

Randazza's reply in a Massachusetts disciplinary proceeding.

But in an email from Randazza to Oron's attorney, Randazza *does* make an offer to never sue Oron again:

From: mjr@randazza.com [mailto:mjr@randazza.com]
Sent: Tuesday, August 07, 2012 8:43 PM
To: Stevan Lieberman
Subject: Hong Kong

I just got a call from our HK counsel.

1)   They spent $80K so far in USD. Liberty's going to want a little more than $25K to satisfy them on that.  Do what you can.

2)   It seems that we could get this resolved without filing anything in the USA except a joint notice to release the paypal funds, if you want to get on the tel to your HK counsel and have the HK counsel stipulate that say $650K in USD can be transferred to our attorneys' account in Hong Kong.

3)   Then, whatever you guy pay me to retain me would come from your paypal account, and would have no real relevance to that.  I spoke to my partner, who was adamant that we should earn $100K if we're to never be able to sue FF Magnat, Bochenko, Novafile.com, oron.com, etc.  forever and ever.  I got him to go with $75K.  But, for that, we'll provide some really great value -- including a jurisdiction derailing plan that you'll drool over.

What do you think ?

UNITED STATES GOVERNMENT

 Connecticut Judge: Attorney Marc Randazza Is Too Unethical ...   390   

## Montana

Randazza isn't licensed in Montana, where he represents the neo-Nazi publisher Andrew Anglin in another high-profile case. He has run into pro hac vice problems here too. In November, the judge in the Anglin case, having learned that Randazza neglected to follow court rules requiring him to update his pro hac vice application with the Nevada discipline, ordered Randazza to comply. Randazza quickly updated his application. But he has continued to fib in court.

## Nevada

In Nevada, Randazza can avoid an actual suspension if he "stays out of trouble" during his probation. Any other grievance against him that results in discipline will likely trigger a suspension. With each deception, Randazza increases that risk.

But other jurisdictions that license him have also been hamstrung by Nevada's tepid response to his misconduct, an outcome that Randazza has wrongly trumpeted as evidence of his innocence with respect to allegations that Nevada didn't consider. Without a judge's authorization or a new complaint, other bar associations are limited in their reciprocal proceedings to addressing only the violations to which Randazza pleaded guilty in Nevada. Some of the bars are upset with Nevada for letting Randazza off easy, according to Dunlap.

"It's good," Dunlap said. "If everyone gets together for a conference, I want Nevada to be all lonely in the corner."


**A few of the documents referenced in or relevant to this story:**

1.) Randazza's pro hac vice application in Connecticut:  https://www.scribd.com/document/402508511/Randazza-Pro-Hac-Vice-CT

2.) Arbitration ruling against Randazza:  https://www.scribd.com/document/402511935/IAA-Stamped

3.) Alex Jones' error-strewn motion to dump Randazza:  https://www.scribd.com/document/402512407/Jones-Motion-for-Extension

4.) Randazza's letter to a Connecticut court about his pro hac vice affidavit:  https://www.scribd.com/document/402512597/Randazza-CT-Letter

5.) Excelsior/Liberty's second amended complaint in bankruptcy court:  https://www.scribd.com/document/402513287/2nd-amended-complaint

6.) Randazza's response to the Arizona Bar:  https://www.scribd.com/document/402515692/Randazza-AZ-Bar-Reply

7.) Portion of Randazza's arbitration testimony regarding XVideos:  https://www.scribd.com/document/402516556/Randazza-arbitration-testimony

8.) Emails between Randazza and TNA counsel: https://www.scribd.com/document/396166781/Randazza-TNA-Bribe

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

LARRY KLAYMAN,

               Plaintiff

    v.

ROGER STONE,

               Defendant.

**Case Number: 19-002672**
**CACE (13)**

### SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

### A BRIEF HISTORY OF MY BACKGROUND

1.    I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.    I am a citizen of Florida and have, at all material times, done business in this judicial circuit.

3.    In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

4.    I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

5.    I passed The Florida Bar the first time I took the exam.

6.    I passed all bar exams on my first attempt, including the District of Columbia Bar.



7.     I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

8.     I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

9.     In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

10.    In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

11.    Contrary to Defendant Roger Stone's ("Defendant Stone") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

12.    For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by

2

Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

13.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

14.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

15.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

16.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which

broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

17.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

18.     I also won a Section 302 case involving paper from Brazil.

19.     All of the Section 337 cases were judge-tried and I won every one of them.

20.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

21.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

22.     I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to

the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

23. On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

24. Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

25. I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

26. My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

27. It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special

Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant

Stone's Mueller indictment.

28.     I have had many other successes in addition to the above-listed victories.

29.     I myself authored a book titled "Whores: Why and How I Came to Fight the

Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant

Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at

an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out

of the maximum 5 stars.

30.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to

say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure

of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See*

Exhibit B.

31.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry

Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party

or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were

other men like Larry early in American history. Their names were Washington, Jefferson,

Madison and Henry. *See* Exhibit B.

32.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge

of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

33.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a

door some public official has marked secret . . . Larry Klayman is himself a conservative, but

there's nothing partisan bout his indignation."

34.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I

appreciate your own maverick – if we can still use that word! – thinking and stands."

35.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference and *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

36.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. Judicial Watch, under Fitton, who is not a lawyer, changed its mission after I left to run for the U.S. Senate. It now primarily focuses on Freedom of Information Act requests, seeking mostly documents, but generally does not bring hard-hitting lawsuits to mete out justice. Thus, I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I am also a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

## MY EXPERIENCES WITH DEFENDANT ROGER STONE

37.     I met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

38.     Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

39.     Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

40.     Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

41.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

42.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

43.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

44.     Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

45.     I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

46.     I maintained in sporadic contact with Defendant Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

47.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Defendant Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

48.     Thus, I was in contact with Defendant Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of

Housing and Urban Development, and Defendant Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

49.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

50.     Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

51.     Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

52.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Defendant Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

53.     I let Defendant Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Defendant Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff

9

Defendant Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

54.     I have not spoken to Defendant Stone since I parted ways with him in 2003 given this experience.

55.     Defendant Stone is an individual and citizen of Florida. Special Counsel Robert Mueller ("Mueller") recently indicted Stone as part of the alleged "Russian Collusion" investigation with seven different felony counts, including lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness and his service dog.

56.     Stone is based in Florida and continuously lives in Florida. His address is reported to be 447 Coral Way, Fort Lauderdale, FL 33301.

57.     Defendant Stone and Fitton from Judicial Watch are working together in concert to try to defame and harm me in this circuit, in Florida and the United States. Compl. at ¶ 19. This is not the first time that Fitton through Judicial Watch has been held to account for defamation in South Florida and thus in this circuit. *Klayman v. Judicial Watch, Inc.*, 13-cv-20610 (S.D. Fla. 2014). *See* Exhibits E , F.

58.     The January 18, 2019 InfoWars video, published in this circuit, contained several false, misleading and defamatory statements concerning me. These false and defamatory statements include but are not limited to:

> **At 1:25, Defendant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."**
>
> **At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment complaint.'"**
>
> **At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong."**

**At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."**

**At 4:11, Defendant Stone says, "For those people out there who think . . . that Larry Klayman's IQ is higher than 70, you're wrong . . ."**

Compl. at ¶¶ 16, 18, 21, 24, 26.

59.     The March 22, 2017 Youtube video, published in this circuit, contained false, misleading and defamatory statements concerning me. These false and defamatory statements include but are not limited to:

> **At 0:45 in the Youtube Video, Defendant Stone says, "Now comes gadfly right-wing lawyer, Larry Klayman, to say that Alex Jones and InfoWars have violated the law in their release of classified documents and will be prosecuted."**
>
> **At 1:00 in the Youtube Video, Defendant Stone Says, "To be clear, Larry Klayman is a moron. He has never one a case in court in his life. He may have won a few motions. He is a lightweight. He is a know-nothing . . ."**

Compl. at ¶¶ 28, 30. There were other false and misleading statements in the video which are incorporated by reference in the Complaint. These examples are just a few.

60.     Defendant Stone acted with malice when he published the false, misleading and defamatory statements concerning me because he knew they were false or acted with a reckless disregard to their truth, as set forth herein.

61.     Defendant Stone not only acted with malice when he published the false, misleading and defamatory statements concerning me, but he also had motives to maliciously defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Defendant Stone had reason to know that his statements were false.



62.     Defendant Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

63.     Since the time I let Defendant Stone go as my campaign manager in late 2003, Defendant Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Defendant Stone is not an honorable, ethical or honest person. He has been widely and rightly called a self-styled "dirty trickster" In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix,

https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

64.     When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Defendant Stone, or any article in which he wrote, as Defendant Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Defendant Stone, a South Florida citizen. I did not want to be quoted or associated at all with Defendant Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller.

65.     In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Defendant Stone or had ties to Defendant Stone, either as a guest or as a host, because I strongly felt at the time that Mueller may indict Defendant Stone. Defendant Stone was at the time a host on InfoWars.

12

66.     I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Defendant Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

67.     During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Defendant Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Defendant Stone and she did.

68.     I also warned my client at the time, Dennis Montgomery, to stay away from Defendant Stone.

69.     Defendant Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he is a material witness in the Mueller investigation as Defendant Stone obviously feared that he would testify against him to Mueller. Defendant Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

70.     In sum, Defendant Stone tried to trade off my clients and I shut this down every time in order to protect my clients from Defendant Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Defendant Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

71.     This, in addition to other information that will be meted out in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and

defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients.

72.     This vindictive, malicious retaliation by Defendant Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Defendant Stone is both unstable and unhinged (*See* CDs containing videos of defamatory statements and publications) and apparently paranoid and he tried to prevent collaboration at all costs in order to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even allegedly threatened to kill Credico's service dog, for which he was in part indicted.

## DAMAGES

73.     As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

74.     Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

75.     Defendant Stone's statements in this instance have caused harm to my reputation, good will and well being in this circuit, throughout Florida, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

76.     There was never any single instance of someone making a sexual harassment complaint against me during my almost ten years at Judicial Watch. Defendant Stone's statements to the contrary are false and defamatory and made with malice.

77.     Defendant Stone acted with malice when he published that I was "ousted" because of a sexual harassment complaint because he knew that was false. Compl. at ¶ 19. Defendant Stone knew or had reason to know that this was false, as he was my campaign manager when I left Judicial Watch.

78.     Now, Defendant Stone is working with Fitton to defame me. Fitton has a motive to defame me and collaborate with Defendant Stone. Fitton has always felt competitive with me (ever since I hired him in 1998) and he is trying to get rid of any competition. Indeed, Fitton is not a lawyer and is in essence running a public interest law firm, but passing himself off as a lawyer. Just last week, Fitton and Judicial Watch filed a complaint to obtain documents about the raid on Defendant Stone's house when he was arrested on January 25, 2019, showing again their joint collaboration.     https://www.judicialwatch.org/press-room/press-releases/judicial-watch-sues-doj-for-roger-stone-raid-documents/

79.     In fact, upon my voluntary departure from Judicial Watch in 2003 to run for the U.S. Senate, I discovered that Fitton had lied to me upon my hiring him and that in fact he had not graduated from George Washington University, as he represented to me personally and in his resume. Defendant Stone has also put others up to defaming me and my client Dr. Corsi. Michael Caputo has done so, for which he also has been sued. So too has a person named Peter Santilli, for which he also has been sued.

80.     The damage done to me and my clients Dr. Corsi, Cliven Bundy, Schaeffer Cox, and the Gold Star parents of Extortion 17, whose sons died in combat in Afghanistan, because of Defendant Stone is continuing. As just one example, just two days ago, a person approached me in an elevator and told me that I was "ousted" at Judicial Watch.

81.     Defendant Stone acted with malice when he published all of the defamatory statements. He knew the statements were false or had a reckless disregard for their truth. He had reason to know his false and misleading statements were false.

82.     I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendant Stone.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 16TH DAY OF APRIL OF 2019.

Larry Klayman

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Sacramento
Subscribed and sworn to (or affirmed)
before me on this 16 day of April,
20 19 by Larry Klayman
proved to me on the basis of satisfactory
evidence to be the person(s) who
appeared before me.

Signature

ROBERT C. MUEHLEISEN
Notary Public - California
Sacramento County
Commission # 2282990
My Comm. Expires Mar 26, 2023

LK
4/16/19

# EXHIBIT A



*Larry Klayman is a prickly troublemaker uncongenial to party and ideological establishment.*
Robert Novak, columnist

# WHORES

## WHY AND HOW I CAME
## TO FIGHT THE ESTABLISHMENT

### LARRY KLAYMAN
FOUNDER OF JUDICIAL WATCH AND FREEDOM WATCH

# EXHIBIT B



©1998, The Washington Post. Photography by Larry Morris. Reprinted with permission.

*...his idea of fun is trying to kick down a door some public official has marked secret...Larry Klayman is himself a conservative, but there's nothing partisan about his indignation.*
—BILL MOYERS, "NOW" PBS

*Larry...I appreciate your own maverick—if we can still use that word!—thinking and stands.*
—FRANK RICH, COLUMNIST FOR *THE NEW YORK TIMES*

*That* Time *magazine has yet to name Larry Klayman "Man of the Year" is a failure of* Time, *not Klayman's. The work he and Judicial Watch did on the Brown case is stunning.*
—JACK CASHILL, AUTHOR OF *RON BROWN'S BODY*

*Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology...That's because he is fearless and relentless in the pursuit of justice...There were other men like Larry throughout American history. Their names were Washington, Jefferson, Madison and Henry.*
—JOSEPH FARAH, WORLDNETDAILY.COM

*...through his challenge of secrecy rules, Larry Klayman has become a force in Washington.*
—LOUIS JACOBSON, *NATIONAL JOURNAL*

*Nobody ever accused Larry Klayman of thinking small, but his latest suit may be outsized by even his standards. The former head of conservative watchdog Judicial Watch who now runs Freedom Watch has filed a $10 trillion class action against Iran at the U.S. District Court for the District of Columbia.*
—*THE NATIONAL LAW JOURNAL*

$26.95

ISBN: 978-0-9792012-2-6

5 2 6 9 5

9 780979 201226

# EXHIBIT C



# ABOUT LARRY KLAYMAN



Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.



Larry speaks four languages—English, French, Italian, and Spanish —and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier.)

# EXHIBIT D



**FREEDOM**WATCH     JOIN OUR FIGHT AT WWW.FWUSA.ORG

# LARRY KLAYMAN – THE ONE MAN TEA PARTY

By Dr. Richard Swier (Scribe)
RedCounty.com
July 31, 2010

Long before there was a TEA Party, Glenn Beck 912 movement, 13 Patriots and thousands of others, there was Larry Klayman. Larry believes it is more important to be virtuous than be liked.

**Larry believes there is an ultimate right and wrong.**

Some of you may not know Larry Klayman but you should. If you believe in the Constitution of the United States and that the Executive, Legislative and Judicial branches of our federal government are corrupt to the core then you need to read Larry's book, *WHORES: Why and How I Came to Fight the Establishment.*

If you see our courts legislating from the bench rather than enforcing the law as in Arizona then you will love Larry Klayman. If you love politics and want to understand what really happens behind the scenes get his book. I just finished reading WHORES and could not put it down. It is a mosaic of both the man and his struggles against an out of control government bent on aggrandizing itself at the expense of the people and the law. It is about corruption on the part of both parties writ large. I found it particularly interesting because of Larry's insights into Florida politics. You see Larry ran for the very same U.S. Senate seat Marco Rubio is seeking. Larry ran against, among others, Bill McCollum and Mel Martinez. If you want to learn more about Florida politics and political insiders, read this book.

Larry is the founder of Judicial Watch and Freedom Watch USA. Freedom Watch USA "is the only group that speaks through actions, rather than just words." When reading his book I found it a fascinating personal and professional journey that reflects the work of a real patriot. Larry has won my patriot award for being a thorn in the side of Iran, Hugo Chavez, Bill and Hillary Clinton, Dick Cheney, George W. Bush and Barack Obama. Not a bad record if I say so myself.

I really felt a symbiotic relationship with Larry as I read his story. When you speak truth to power you are always attacked. The progressive model is identify the target, marginalize it and then demonize it. That is the cross that Larry, TEA Party members and others who are like minded bear today.

**Larry was fighting the establishment since the early 1990s and he continues to do so even today with the filing of a lawsuit against Elena Kagan, President Obama's nominee for the U.S. Supreme Court.**

According to the WorldNetDaily.com column, *Papers prepped to disbar Elena Kagan*:

One of Washington, D.C.'s most feared and fearless corruption watchers has told WND he intends to file an ethics complaint to have Supreme Court nominee Elena Kagan disbarred from practicing before the court she aspires to join – and possibly subjected to criminal prosecution – for her role in an escalating controversy over partial-birth abortion.

As WND reported, dozens of pro-life organizations are already asking the Senate to investigate Kagan's 1997 amendment to an American College of Obstetricians and Gynecologists report, which was then used by the Supreme Court as justification for overturning Nebraska's partial-birth abortion ban in 2000.

In her confirmation hearings, Kagan defended the amendment, saying, "My only dealings with (the College) were about talking with them about how to ensure that their statement expressed their views."

Several analyses have concluded, however, that Kagan's amendment dramatically changed the meaning of the organization statement, and court records show the statement was passed off on the Supreme Court as official scientific opinion, even though the organization's panel of scientists never approved Kagan's wording.

Klayman told WND he believes Kagan's behind-the-scenes work constitutes "conspiracy to defraud the Supreme Court," and he intends to take the evidence that has been compiled by the pro-life groups to file a complaint before the clerk's office of the U.S. Supreme Court, seeking to have Kagan disbarred as a practicing lawyer infront of the Supreme Court.

So the battle goes on for Larry, you and me. I hope you will read Larry's book and make it a point to learn more about the great work he is doing to stop corruption in our courts, at the White House and in Congress. Larry has been a one man TEA Party, now it is time for us to join with him as we together fight in the same cause – a grass roots revolution to save the Republic.

http://www.redcounty.com/content/larry-klayman-one-man-tea-party

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 13-20610-CIV-ALTONAGA

**LARRY KLAYMAN**,

       Plaintiff,

v.

**JUDICIAL WATCH, INC.**,

       Defendant.

_____/

### FINAL JUDGMENT

**THIS CAUSE** came for trial before the Court and a jury, United States District Judge, Cecilia M. Altonaga, presiding, and the issues having been duly tried and the jury having duly rendered its verdict on June 10, 2014, it is

**ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, Larry Klayman, and against Defendant, Judicial Watch Inc., in the amount of **$156,000.00** for compensatory damages and **$25,000.00** for punitive damages, totaling **$181,000.00**, for which sum let execution issue. Requests for costs and attorneys' fees shall not be submitted until after any post-trial motions are decided or an appeal is concluded, whichever occurs later. This judgment shall bear interest at the rate as prescribed by 28 U.S.C. section 1961, and shall be enforceable as prescribed by 28 U.S.C. sections 2001–2007, 28 U.S.C. sections 3001–3308, and Federal Rule of Civil Procedure 69(a). The Clerk shall mark this case closed.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 11th day of June, 2014.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

# EXHIBIT F

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 13-20610-CIV-ALTONAGA

**LARRY KLAYMAN,**

      Plaintiff,

v.

**JUDICIAL WATCH, INC.,**

      Defendant.

_____/

## <u>Verdict Form</u>

We, the jury, unanimously find as follows:

1.    Do you find from a preponderance of the evidence that Plaintiff Larry Klayman was defamed by Defendant Judicial Watch?

        Yes  ✓   No _____

(If your answer is "yes," proceed to the next question. If the answer is "no," sign the verdict form.)

2.    Do you find from a preponderance of the evidence that Plaintiff Larry Klayman should be awarded compensatory damages against Defendant Judicial Watch?

        Yes  ✓   No _____

If your answer is "Yes,"

      in what amount: $ 156,000.00 .

(If your answer is "yes," skip question 3 and proceed to question 4. If your answer is "no," proceed to question 3.).

3. Do you find from a preponderance of the evidence that Plaintiff Larry Klayman should be awarded nominal damages against Defendant Judicial Watch?

> Yes _____ No _✓_____

If your answer is "Yes,"

> in what amount: $ __N/A____ .

(Proceed to question 4.).

4. Under the circumstances of this case, state whether you find by clear and convincing evidence that punitive damages are warranted against Defendant Judicial Watch:

> Yes _✓___ No _____

If your answer is "Yes,"

> in what amount: $ _25,000.00_ .

So say we all this _10_ day of June, 2014.

_____
Foreperson

## CONFIDENTIAL SEVERANCE AGREEMENT

This CONFIDENTIAL SEVERANCE AGREEMENT ("Agreement") is made and entered into by and between JUDICIAL WATCH, INC. ("Judicial Watch"), and LARRY E. KLAYMAN ("Klayman"), who are sometimes collectively referred to as the "Parties."

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

1. **Termination of Employment; Resignation.** Klayman's employment shall terminate effective September 19, 2003 (the "Separation Date"), and it shall be treated for all purposes as a voluntary resignation. Upon execution of this Agreement, Klayman shall submit a letter resigning from his positions as Treasurer and a member of the Board and all other positions he holds at Judicial Watch and its affiliated entities, including Judicial Watch of Florida, Inc.

2. **Severance Pay.** Subject to paragraphs 15 and 22 below, Judicial Watch shall pay Klayman as severance a lump sum payment equal to $400,000.00, from which shall be deducted all customary and legally required federal, state, and local tax and other withholdings (the "Severance Pay"). As soon as practicable after execution of this Agreement and in no event later than September 24, 2003, the Severance Pay shall be wired or otherwise deposited in U.S. funds to an escrow account maintained for clients of the law offices of Jordan, Coyne & Savits, L.L.P. to be disbursed to Klayman following the later of the expiration of the revocation period referred to in paragraph 15 of this Agreement and a finding by the authorized committee referred to in paragraph 22 that the Severance Pay is reasonable. Klayman acknowledges that he is not legally entitled to the Severance Pay or other consideration beyond payment of compensation through his last day of work, and that the Severance Pay and other consideration being provided to him pursuant to this Agreement is intended as, and is, consideration for his execution of this Agreement and in order to amicably resolve, on the terms set forth in this Agreement, differences between the Parties and in recognition of Klayman's leadership and contribution to the founding and development of Judicial Watch in a way commensurate with similar arrangements for principal executives of comparable organizations. The Severance Pay and other consideration being provided to Klayman pursuant to this Agreement is also intended to, and does, fully satisfy all amounts, if any, owed to Klayman by Judicial Watch, including, but not limited to, any amounts owed to him for accrued but unused vacation and sick leave. The Severance Pay shall be included in the IRS Form W-2 that Judicial Watch shall issue to Klayman for 2003.

3. **Insurance.**

A. Health Insurance. In the event Klayman properly and timely elects to continue his family health insurance coverage following the termination of his employment in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Judicial Watch shall pay the cost of such insurance, to the same extent that it paid Klayman's family health insurance coverage during his employment, for a period of twelve (12) months following the Separation Date. Nothing herein shall limit Klayman's right, consistent with the

## Confidential Severance Agreement

terms of the insurance plan and COBRA, to continue to maintain the health insurance coverage beyond the twelve (12) month period at his own expense.

      B.    <u>Malpractice Insurance</u>. Judicial Watch shall purchase and maintain professional liability insurance that provides defense and indemnity coverage for any and all legal work performed by Klayman for or on behalf of Judicial Watch while he was employed by Judicial Watch or after the Separation Date.

## 4. <u>Confidential Information and Judicial Watch Property</u>.

      A.    <u>Confidential Information</u>. Klayman agrees that all non-public information and materials, whether or not in writing concerning Judicial Watch, its operations, programs, plans, relationships, donors, prospective donors, clients, prospective clients, past or current employees, contracts, financial affairs or legal affairs (collectively, "Confidential Information") are confidential and shall be the exclusive property of Judicial Watch to which Klayman has no right, title or interest. By way of illustration, but not limitation, Confidential Information includes matters not generally known outside Judicial Watch, such as projects, plans, research data, research projects, contacts, financial data, personnel data, donor lists, donor data, fundraising strategies and methods, computer programs, web site plans and developments, client lists, client data, contacts at or knowledge of clients or donors or prospective clients or donors, litigation strategies, work-product, supplier and vendor lists, developments relating to existing and future programs, services or products offered, marketed or used by Judicial Watch, and data relating to the general operations of Judicial Watch. Klayman agrees that after the Separation Date, he shall not disclose any Confidential Information to any person or entity or use Confidential Information for any purpose without written approval by an officer of Judicial Watch, unless and until such Confidential Information has become public knowledge through no fault or conduct by Klayman.

      B.    <u>Judicial Watch Property</u>. Klayman agrees that all documents, computer tapes and disks, computer printouts, computer hardware and software, office furniture and furnishings, memorabilia, equipment, supplies, keys, credit cards, publications, manuals, working papers, notes, reports, client lists, donor lists, and any other tangible items or materials that were created or used by Klayman while performing his duties for Judicial Watch or which otherwise came into Judicial Watch's custody or control by virtue of Klayman's employment with Judicial Watch ("Judicial Watch Property") are and shall be the exclusive property of Judicial Watch to which Klayman has no right, title or interest. Upon reasonable advance notice to Judicial Watch, Klayman shall be permitted to remove his personal effects (e.g., family photos and other similar personal property that he purchased with his personal funds), as well as a digital copy of his electronic "Rolodex", from Judicial Watch's offices.

      C.    <u>Return of Property and Confidential Information</u>. Klayman agrees that all Judicial Watch Property and Confidential Information, in all their tangible or intangible forms, whether created by Klayman or others, that came into Klayman's custody or possession, including, without limitation, all computer equipment, cellular phones, personal digital assistants ("PDAs"), keys, including keys to the Volvo automobile currently owned by Judicial Watch, (VIN No. YV1CZ91H931018257) title and registration documents for the Volvo automobile,

## Confidential Severance Agreement

passwords, security cards, security codes, identification badges, and any other means of access to
Judicial Watch's Property and Confidential Information, shall be delivered to the President of
Judicial Watch, or his designated representative, on or before the Separation Date. Any property
or Confidential Information which Klayman cannot return to Judicial Watch on or before the
Separation Date, notwithstanding his best efforts, shall be returned as soon as practicable
thereafter. In any event, Klayman shall not use or access any Judicial Watch Property or
Confidential Information or copies thereof following the Separation Date, provided, however,
that Klayman may continue to use through September 24, 2003 the Judicial Watch cell phone
and laptop computer currently in his possession, at which time he shall return them to Judicial
Watch.

      D.    <u>Client and Donor Information</u>. Klayman agrees that Klayman's obligation
not to disclose or use Judicial Watch's Confidential Information and Klayman's obligation to
return all Judicial Watch Property and Confidential Information also extend to such types of
proprietary, secret or confidential information, materials and property of clients or donors of
Judicial Watch or of other third parties who may have disclosed or entrusted the same to Judicial
Watch or to Klayman. Klayman expressly agrees and acknowledges that, following the
Separation Date, he shall not retain or have access to any Judicial Watch donor or client lists or
donor or client data.

      E.    <u>Limited Access to Certain Property in the Public Domain</u>. Anything in
subparagraphs A through D above to the contrary notwithstanding, Klayman shall be entitled to
obtain from Judicial Watch copies of press clips, press releases, other press materials,
photographs, artist renderings, and television show videos involving him which are in the public
domain and not confidential, provided that he shall use such materials solely for his personal, use
and not for any partisan or other political purpose. Klayman shall reimburse Judicial Watch the
costs it incurs in providing such copies.

      F.    <u>Limited Access to Certain Confidential Information</u>. Anything in
subparagraphs A through D above to the contrary notwithstanding, subject to Judicial Watch's
consent, which consent shall not be unreasonably withheld, Klayman shall be afforded access to
such Confidential Information as he may reasonably require in order to defend or respond to any
accusation, action or threat of action against him arising out of or relating to his tenure at Judicial
Watch. Such access shall include an opportunity on reasonable notice to examine and copy, at
his cost, Confidential Information related to such accusation, action or threat, provided that such
Confidential Information shall be used or disclosed by him solely in connection with such
defense or response and provided, further, that he shall take reasonable steps to protect such
Confidential Information from any use or disclosure by others other than in connection with such
defense or response (e.g., by Protective Order or Confidentiality Agreement).

    5.   **Non-Competition; Non-Solicitation**. In consideration of the payment described in
paragraph 6 below, Klayman agrees to the following:

      A.    <u>Judicial Watch's Goodwill and Business Interests</u>. Klayman agrees and
acknowledges that Judicial Watch has, over the course of many years and through substantial
investment and efforts by Judicial Watch, developed goodwill in North America and

## Confidential Severance Agreement

internationally, and that Judicial Watch's goodwill is associated with its ongoing educational and other operations and its use of certain trade names, trade marks, service marks and "trade dress." Klayman also agrees that the trade secrets and other valuable Confidential Information and Judicial Watch Property (as such terms are defined above) to which Klayman had access during his employment and as an officer and director of Judicial Watch, the substantial relationships with prospective and existing contacts, clients and donors of Judicial Watch that Klayman formed and maintained, the specialized training and opportunities that Klayman received from Judicial Watch, and Judicial Watch's goodwill are, individually and collectively, valuable and legitimate business interests of Judicial Watch that Judicial Watch rightfully seeks to preserve and protect.

B.    Covenant Not to Compete or Solicit. Klayman agrees that, in order to enable Judicial Watch to preserve and protect Judicial Watch's valuable and legitimate business interests, including, but not limited to, those valuable and legitimate business interests set forth in paragraph 5 A, and in exchange for the additional consideration referred to in paragraph 6 below (which the parties acknowledge to be separately bargained for), Klayman shall not, for a period of two (2) years following the Separation Date, directly or indirectly:

(i) work or render advice as an individual or sole proprietor in Competition with Judicial Watch or work or render advice as an employee, agent, independent contractor, consultant or representative of any person, firm or legal entity which is engaged in or has plans to enter into Competition with Judicial Watch. For purposes of this Agreement, the term "Competition" means directly or indirectly engaging in the work or advancing the mission of any ethics, anti-corruption, public integrity and government accountability watchdog or similar public interest or educational organization, or engaging in any other activities the purpose or effect of which would be to provide information, programs, publications, services or products that Judicial Watch offers, develops or sells or has plans to offer, develop or sell, as of the Separation Date;

(ii) solicit or in any manner encourage or induce, or attempt to solicit, encourage or induce, any employee of Judicial Watch to leave the employ of Judicial Watch;

(iii) solicit or in any manner encourage or induce, or attempt to solicit, encourage or induce, any client of Judicial Watch to terminate its attorney-client relationship with Judicial Watch; provided, however, that Klayman shall not be precluded from providing legal representation to any client, if requested by the client, in his capacity as a lawyer in private practice; or

(iv) solicit, divert, interfere in or take away, attempt to solicit, divert, interfere in or take away, or otherwise assist or encourage third parties to solicit, divert, interfere in or take away the support or patronage of any of the donors, clients or supporters of Judicial Watch, or prospective donors, clients or supporters of Judicial Watch; provided, however, that this provision shall not prohibit Klayman from soliciting contributions to any entity that is not engaged in Competition with Judicial Watch from any person who may be an existing or prospective donor of Judicial Watch.

### Confidential Severance Agreement

6. **Payment on Account of Klayman's Agreement Not to Compete or Solicit.** Subject to paragraphs 15 and 22 below, Judicial Watch shall pay Klayman $200,000.00 in consideration of his agreement not to compete or solicit, as set forth in paragraph 5 above (the "Non-Compete Payment"). As soon as practicable after execution of this Agreement and in no event later than September 24, 2003, the Non-Compete Payment shall be wired or otherwise deposited in U.S. funds in escrow to be maintained and disbursed to Klayman in the same manner and subject to the same conditions as the Severance Pay. The Non-Compete Payment shall be treated as "Other Compensation" for which Judicial Watch will issue Klayman a Form 1099. Klayman shall pay all federal, state and other taxes required to be paid in connection with such payment and indemnifies Judicial Watch and its officers from any liability for payment of payroll, income, or other taxes in connection with the Non-Compete Payment.

7. **Enforcement of Paragraphs 4 and 5.** Klayman understands and acknowledges that the restrictions contained in paragraphs 4 and 5 of this Agreement are reasonably necessary for the protection of the legitimate business interests and goodwill of Judicial Watch and Klayman considers these restrictions necessary and reasonable for such purpose. Klayman further acknowledges and agrees that any breach of any provision in paragraphs 5 or 6 of this Agreement will cause Judicial Watch substantial and irreparable injury and, therefore, in the event of any such breach, Klayman agrees that Judicial Watch, in addition to such other remedies which may be available, shall be entitled to specific performance and other injunctive relief without the necessity of posting a bond.

8. **IRS Audit.** In connection with the ongoing audit of Judicial Watch, the Parties agree to work cooperatively and in good faith to timely and appropriately respond to any inquiries or allegations by IRS relating to matters involving activities or other conduct on the part of Klayman or K&A. In this connection, Judicial Watch agrees to promptly provide Klayman's designated representative a copy of any IRS communications or other document containing such inquiries or allegations; Klayman agrees then to promptly provide input to Judicial Watch, through the Parties' respective legal representatives, regarding any such matter sufficiently in advance of the required response date to IRS, that such input can be considered and incorporated as appropriate in Judicial Watch's response to IRS. In addition, Judicial Watch agrees (i) to furnish Klayman's designated legal representative copies of all written submissions to IRS relating to any such matters, for their review and comment, timely and as soon as reasonably available, and to provide them copies of the final versions of all such submissions contemporaneously with their being sent to IRS; (ii) to timely apprise Klayman's designated legal representative of material developments concerning any such matters, including by furnishing, upon request, periodic reports of the status of any such matters and by providing copies of correspondence or other IRS produced written materials regarding any such matters. In addition, upon Klayman's request, Judicial Watch may afford Klayman's designated legal representative an opportunity to participate in meetings and telephone discussions with IRS regarding such matters whenever Judicial Watch reasonably deems such participation appropriate, consistent with the first sentence of this paragraph. All information provided to or otherwise learned by Klayman and/or his legal representative with respect to or in connection with IRS audit shall be deemed and treated as Confidential Information, shall be used by Klayman and his legal representative solely in connection with the purposes described in this paragraph, and shall not be used or disclosed by them for any other purpose.

Confidential Severance Agreement

## 9. Personal Guaranties.

      A.    Credit Cards. Judicial Watch shall remove Klayman as guarantor of all credit cards issued to Judicial Watch, including, without limitation Judicial Watch's American Express card, within thirty (30) days of the Separation Date.

      B.    Lease Guaranty. Judicial Watch agrees to continue to work in good faith to remove Klayman as guarantor of its lease for its Washington, D.C. headquarters located at 501 School Street, S.W., Suite 500, Washington, D.C., 20024. Klayman acknowledges and agrees that he shall not receive any additional compensation from Judicial Watch above and beyond the Severance Pay and other benefits provided for in this Agreement for his guarantying the lease.

## 10. Reimbursement of Expenses. 

Judicial Watch agrees to review and reimburse Klayman for any legitimate and properly documented business expenses he submits to Judicial Watch pursuant to this paragraph in accordance with Judicial Watch's normal and customary reimbursement polices and practices. Klayman agrees to submit all business expenses for which he seeks reimbursement from Judicial Watch, along with details and justifications for those expenses, to Judicial Watch within 30 days after the Separation Date. Klayman further agrees to reimburse Judicial Watch for personal costs or expenses incurred by him during his employment, if any, that Judicial Watch may determine in good faith were mistakenly charged or allocated as costs or expenses of Judicial Watch, as well as any additional expenses that Klayman has billed to Judicial Watch or charged to a Judicial Watch credit card that Judicial Watch determines in good faith are personal expenses of Klayman. Klayman shall reimburse Judicial Watch for any such amounts within seven (7) days of being notified by Judicial Watch and being presented with supporting documentation of the amount, date and category of cost or expense items for which reimbursement is sought.

## 11. Klayman & Associates, P.C.

      A.    Klayman, and by its signature below, Klayman & Associates, P.C. ("K&A") re-affirm and acknowledge the debt of K&A to Judicial Watch, which was in the amount of $78,810 as of December 31, 2002, and agree that K&A shall pay the then full outstanding balance of the debt (including additional amounts allocated to K & A by Judicial Watch's accountants in accordance with their customary practice regarding this debt), without offset or deduction, together with accrued interest of 8% per annum, on or before May 15, 2004, per the terms of the Minutes of the May 15, 2002 Meeting of the Board of Directors of Judicial Watch. Klayman and K & A expressly acknowledge that Judicial Watch is not indebted to K & A.

      B.    Klayman agrees to remove all K&A files and boxes from Judicial Watch's office premises at Klayman's expense before the Separation Date or within a reasonable time thereafter, at his expense. Should Klayman not remove such files and boxes within sixty (60) days of the Separation Date, Judicial Watch may destroy them. Klayman and Judicial Watch agree that Judicial Watch shall arrange for all K&A's boxes currently being stored under Judicial Watch's name and account with Iron Mountain to be transferred to K&A's account with Iron

## Confidential Severance Agreement

Mountain, and that any additional files or boxes of K&A that Judicial Watch locates or identifies in the future shall likewise be transferred to K&A's Iron Mountain account.

12. **Withdrawal of Appearance in Judicial Watch Litigation**. Except as otherwise agreed by Judicial Watch, and consistent with the applicable rules of court, Klayman's appearance as counsel shall be withdrawn in all legal proceedings in which Judicial Watch currently is involved as a party or as counsel for any person or entity.

13. **Cooperation**. Following the Separation Date, Klayman agrees to make himself reasonably available to Judicial Watch to answer questions regarding pending Judicial Watch litigation matters and other business in which Klayman was involved during his employment with Judicial Watch, at no cost. Klayman also understands and acknowledges that, following the Separation Date, Judicial Watch may ask him to serve as counsel in on-going Judicial Watch litigation matters on such terms, including compensation terms, as Judicial Watch, its clients and Klayman may agree. Judicial Watch acknowledges and understands that, apart from answering questions related to Judicial Watch litigation matters and other business in which Klayman was involved during his employment, Klayman shall have no obligation to accept any post-Separation Date assignments from Judicial Watch. Klayman acknowledges and agrees that he shall not perform any post-Separation Date assignment from Judicial Watch without having previously received written authorization to perform the assignment from an officer of Judicial Watch.

14. **Mutual Releases.**

A. _Release by Klayman_. Klayman, for himself and his heirs, successors, assigns, employees, agents and other representatives, and anyone acting by, through or under them, hereby releases and forever discharges Judicial Watch, and each and all of its affiliates, subsidiaries and related entities, and its and their past and present directors, officers, managers, supervisors, employees, attorneys, and agents, including, without limitation, Paul Orfanedes, Thomas Fitton and John Maruna, and their respective predecessors, successors and assigns, in their capacities as such (collectively, "the Judicial Watch Releasees"), from any and all claims, actions, suits, damages, liabilities, losses or expenses of whatever kind and nature which exist as of the date of this Agreement, whether such claims, actions, suits, damages, liabilities, losses or expenses are known or unknown, including, but not limited to, any claim based on or arising under any civil rights or employment discrimination laws, such as the Americans with Disabilities Act of 1992; the Fair Labor Standards Act of 1938, as amended; the Age Discrimination in Employment Act ("ADEA"), as amended; Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the District of Columbia Human Rights Act; or any other federal, state or local statutes, laws or legal principles or any common law contract or tort claims now or hereafter recognized. Klayman specifically acknowledges that he understands that by signing this Agreement he waives all claims he ever had or now has against any of the Judicial Watch Releasees, except for claims relating to any breach of this Agreement.

B. _Release by Judicial Watch_. Judicial Watch, for itself and its affiliated corporations and entities, and anyone acting by, through or under them, including, without limitation, Paul Orfanedes, Thomas Fitton and John Maruna, hereby releases and forever

## Confidential Severance Agreement

discharges Klayman, and anyone acting by or through him, including his attorneys and agents, and his and their respective heirs, successors, and assigns from any and all claims, actions, suits, damages, liabilities, losses or expenses of whatever kind and nature which exist as of the date of this Agreement, whether such claims, actions, suits, damages, liabilities, losses or expenses are known or unknown. Judicial Watch specifically acknowledges that it understands that by signing this Agreement it waives all claims it ever had or now has against Klayman, except for claims relating to any breach of this Agreement.

15. **Right to Consider/Revocation.** Employees forty (40) years of age or older have specific rights under the Older Workers Benefit Protection Act ("OWBPA"), which prohibits discrimination on the basis of age. It is Judicial Watch's desire and intent to make certain that Klayman fully understands the provisions and effects of the release contained in paragraph 14(A). To that end, Klayman has been encouraged and has been given the opportunity to consult with legal counsel for the purpose of reviewing the terms of this Agreement. Klayman acknowledges that, consistent with the provisions of the OWBPA, he has been given a period of at least twenty-one (21) days within which to consider this Agreement before signing it, and that he may waive the 21-day period and sign this Agreement prior to its expiration. This Agreement will become effective immediately upon execution by the Parties, but Klayman shall have seven (7) days after his execution of the Agreement to revoke the Agreement. Any revocation must be in writing and delivered to Judicial Watch, Inc., c/o Thomas Fitton, President, 501 School Street, S.W., Suite 500, Washington, D.C. 20024 before the expiration of the seven (7) revocation period. In addition, consistent with the provisions of the OWBPA and other employment discrimination laws, the release contained in paragraph 14(A) does not preclude Klayman from filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), participating in an EEOC investigation, or challenging the validity of this Agreement, but he will not be entitled to any monetary or other relief from the EEOC or from any court as a result of litigation brought on the basis of, or in connection with, such charge, except if and to the extent that the release and waiver contained in paragraph 14(A) are held to be invalid or unenforceable (in which event, Judicial Watch will be entitled to restitution or set off for the amounts paid to Klayman hereunder, as and to the extent determined by the court).

16. **Covenant Not to Sue.** Klayman expressly represents and warrants that, except as may be necessary to enforce this Agreement, neither he nor any person, organization or other entity on his behalf has or will file, charge, claim, sue or cause or permit to be filed, charged or claimed, any civil action or legal proceeding seeking personal monetary or other relief against Judicial Watch or any of its past or present directors, shareholders, officers, managers, supervisors, employees, attorneys, or agents, including, without limitation, Paul Orfanedes, Thomas Fitton and John Maruna, involving any matter occurring at any time in the past up to and including the date of this Agreement or involving any continuing effects of any acts or practices which may have arisen or occurred prior to or on the date of this Agreement. Judicial Watch expressly represents and warrants that, except as may be necessary to enforce this Agreement, neither it nor any person, organization or other entity on its behalf has or will file, charge, claim, sue or cause or permit to be filed, charged or claimed, any civil action or legal proceeding

8

## Confidential Severance Agreement

seeking personal monetary or other relief against Klayman, K&A or their respective agents and attorneys.

17. **Non-Disparagement**. Klayman expressly agrees that he will not, directly or indirectly, disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about Judicial Watch or its present or past directors, officers, or employees. Judicial Watch expressly agrees that its present directors and officers namely Paul Orfanedes and Thomas Fitton, will not, directly or indirectly, disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about Klayman. Nothing in this paragraph is intended to, nor shall be deemed to, limit either party from making fair commentary on the positions or activities of the other following the Separation Date.

18. **Press Release; Statements Of the Parties**. On or before September 27, 2003, Judicial Watch shall issue a press release announcing that Klayman is leaving Judicial Watch. That press release shall state:

> Judicial Watch announced today that Larry Klayman has stepped down as Chairman and General Counsel of Judicial Watch,, to pursue other endeavors.   Tom Fitton, who is President of Judicial Watch, said: "Larry conceived, founded and helped build Judicial Watch to the organization it is today, and we will miss his day to day involvement. Judicial Watch now has a very strong presence and has become the leading non-partisan, public interest watchdog seeking to promote and ensure ethics in government, and Larry leaves us well positioned to continue our important work."

Judicial Watch agrees that Klayman shall be permitted to use, publish and otherwise disseminate to third parties the following additional statement of Judicial Watch: "Larry was the creator and founder of Judicial Watch, and helped build it to be a stable, successful and widely respected organization. We thank him for his service." Klayman agrees that Judicial Watch shall be permitted to use, publish and otherwise disseminate to third parties the following statement of Klayman: "I have left Judicial Watch in good hands and will continue to support it, and I hope you will too." The Parties agree that they will limit any statements to third parties regarding Klayman's leaving Judicial Watch to be consistent with the Press Release and statements contained in his paragraph, except as may be required by law.

19. **Indemnification; Attorneys' Fees**.

     A.     Indemnification by Judicial Watch. Judicial Watch agrees to defend, indemnify and hold harmless Klayman from any monetary sanctions assessed against him personally by a court of law for conduct undertaken by Klayman or others in conjunction with his or their work on Judicial Watch litigation matters, or any breach of its obligations and responsibilities under this Agreement.

### Confidential Severance Agreement

B.     Indemnification by Klayman.  Klayman agrees to defend, indemnify and hold harmless Judicial Watch and each and all of the Judicial Watch Releasees from any and all claims, liabilities, costs, damages or judgments of any and every kind (including, without limitation, attorneys' fees and costs) which Judicial Watch or any of the Judicial Watch Releasees may incur or be threatened with that arise out of any intentional wrongdoing by Klayman, or breach of his obligations and responsibilities under this Agreement, or out of K&A's breach of its obligations under this Agreement. Klayman expressly acknowledges that, pursuant to this paragraph, he shall be obligated to defend, indemnify and hold harmless Judicial Watch from any and all attorneys' fees, court costs or other expenses Judicial Watch may incur on account of Klayman's or K&A's failure to make prompt payment to Judicial Watch in accordance with paragraphs 10 and 11 of this Agreement.

C.     Attorneys' Fees.  The prevailing party in any legal proceeding instituted on account of a Party's breach of this Agreement shall be entitled to an award of the costs incurred in connection with such action, including reasonable attorneys' fees and suit costs.

20. **Confidentiality of this Agreement.**  The Parties will preserve the strict confidentiality of the terms and existence of this Agreement, which shall not be disclosed, communicated or publicized to any third party or any entity other than their respective counsel, accountants, and financial advisors, and, in the case of Klayman, also to his immediate family, directly or indirectly, by implication, gesture, or innuendo, or by any other manner or device; provided, however, that the Parties may disclose the terms of this Agreement: (i) if compelled to do so pursuant to a lawful subpoena or other process from a court of competent jurisdiction or in conjunction with the on-going IRS audit of Judicial Watch; (ii) in connection with litigation between or among the Parties relating to this Agreement; or (iii) if and to the extent necessary to comply with applicable Treasury regulations relating to tax return disclosure.  In the event that either Party is lawfully subpoenaed (or informed that he or it will be subpoenaed) to testify and such testimony forseeably might require the disclosure of information required by this Agreement to be kept confidential, such Party shall promptly notify the other Party in writing so that he or it will have an opportunity to quash the subpoena or otherwise protect his or its interest in the continuing confidentiality of the information.

21. **Full Knowledge of Terms.**  Each Party to this Agreement affirms that he, or in the case of Judicial Watch, its respective authorized officer(s) have read the foregoing Agreement and fully understand its content and effect, was given a reasonable period of time to consider its terms, and is voluntarily entering into this Agreement.  Accordingly, in construing this Agreement, no provision shall be construed against Judicial Watch on the basis that it is the draftsman of this Agreement

22. **Section 4958 Presumption.**  As soon as possible after the execution of this Agreement, Judicial Watch shall appoint an authorized body to conduct, within ten business days following the execution of this Agreement, the process described in Treasury Regulation 53.4958-6, in order to establish a rebuttable presumption that the transactions reflected in this Agreement do not constitute an excess benefit transaction subject to tax under Internal Revenue Code section 4958.  Upon favorable completion of the process by the authorized body and completion of all other requirements set forth herein, amounts due under this Agreement shall be

## Confidential Severance Agreement

released from escrow and paid over to Klayman in accordance with paragraphs 1 and 6 above. If the authorized body does not conclude that the transaction is reasonable, the Parties shall meet promptly to renegotiate in good faith the terms of this Agreement in such a way that the requirements of regulation section 53.4958-6 can be met.

23. **Choice of Law; Consent to Venue and Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to its conflict of laws principles. The Parties consent to the jurisdiction and venue of any state or federal court located within the District of Columbia in any action or judicial proceeding brought to enforce, construe or interpret this Agreement or otherwise arising out of or relating to Klayman's employment.

24. **Notice**. Any and all notices which any Party shall be required or may elect to provide to another Party pursuant to this Agreement shall be a signed writing unless otherwise so agreed. Any and all notices hereunder shall be personally delivered, telecopied (receipt confirmed) or sent by certified or registered mail, postage prepaid, return receipt requested, or by courier service providing evidence of delivery to the other party, at the applicable addresses set forth below:

| | |
|---|---|
| If to Judicial Watch: | Judicial Watch, Inc. |
| | c/o Thomas Fitton, President |
| | 501 School Street, N.W. |
| | Suite 500 |
| | Washington, D.C.  20024 |
| With a copy to: | David Barmak |
| | MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC |
| | 12010 Sunset Hills Rd. |
| | Suite 900 |
| | Reston, VA 20190 |
| If to Klayman: | Larry E. Klayman |
| | 540 Brickell Key Drive, Unit 732 |
| | Miami, Florida  33131 |
| With a copy to: | Herbert N. Beller |
| | Sutherland Asbill & Brennan, L.L.P. |
| | 1275 Pennsylvania Avenue, N.W. |
| | Washington, D.C.  20004-2415 |
| | and |
| | David P. Durbin |
| | Jordan, Coyne & Savits, L.L.P. |
| | 1100 Connecticut Avenue, N.W. |
| | Washington, D.C.  20036 |

## Confidential Severance Agreement

25. **Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, administrators, personal representatives, heirs, predecessors, successors, assigns, directors, agents, employees, trustees and affiliates forever.

26. **Entire Agreement.** This Agreement constitutes the entire agreement and understanding between and among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral agreements and understandings between the Parties with respect to the subject matter of this Agreement. Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not relying on any statements, representations, understandings or promises other than those contained herein. This Agreement shall be interpreted and enforced in all respects based on its express terms and without regard to who drafted the Agreement or any particular provision of the Agreement. Neither the negotiations preceding this Agreement or any draft, term sheet, outline, note, or statement, assertion, representation, or understanding prior to or contemporaneous with the execution of this Agreement shall be used to interpret, change or restrict the express terms and provisions of this Agreement.

27. **Captions.** Captions are inserted herein for convenience, do not constitute part of this Agreement, and shall not be admissible for the purpose of proving the intent of the Parties.

28. **Counterparts.** This Agreement may be executed in counterparts, each of which will be considered an original.

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the dates indicated.

ATTEST:                                                JUDICIAL WATCH, INC.


_____          By: Thomas Fitton, President
Paul Orfanedes                                        Date: 9/19/03
Corporate Secretary


                                                          LARRY E. KLAYMAN


_____          _____
Witness                                                  Date: _____


                                                          KLAYMAN & ASSOCIATES, P.C.


_____          By: Larry E. Klayman, President
Witness                                                  Date: _____

## Confidential Severance Agreement

25. **Binding Effect**. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, administrators, personal representatives, heirs, predecessors, successors, assigns, directors, agents, employees, trustees and affiliates forever.

26. **Entire Agreement**. This Agreement constitutes the entire agreement and understanding between and among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral agreements and understandings between the Parties with respect to the subject matter of this Agreement. Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not relying on any statements, representations, understandings or promises other than those contained herein. This Agreement shall be interpreted and enforced in all respects based on its express terms and without regard to who drafted the Agreement or any particular provision of the Agreement. Neither the negotiations preceding this Agreement or any draft, term sheet, outline, note, or statement, assertion, representation, or understanding prior to or contemporaneous with the execution of this Agreement shall be used to interpret, change or restrict the express terms and provisions of this Agreement.

27. **Captions**. Captions are inserted herein for convenience, do not constitute part of the Agreement, and shall not be admissible for the purpose of proving the intent of the Parties.

28. **Counterparts**. This Agreement may be executed in counterparts, each of which will be considered an original.

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the dates indicated.

ATTEST:

**JUDICIAL WATCH, INC.**

Paul Orfanedes
Corporate Secretary

By: Thomas Fitton, President
Date: _____

**LARRY E. KLAYMAN**

Witness _____

Date: _____

**KLAYMAN & ASSOCIATES, P.C.**

Witness _____

By: Larry E. Klayman, President
Date: _____

12

## Confidential Severance Agreement

25. **Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, administrators, personal representatives, heirs, predecessors, successors, assigns, directors, agents, employees, trustees and affiliates forever.

26. **Entire Agreement.** This Agreement constitutes the entire agreement and understanding between and among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral agreements and understandings between the Parties with respect to the subject matter of this Agreement. Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not relying on any statements, representations, understandings or promises other than those contained herein. This Agreement shall be interpreted and enforced in all respects based on its express terms and without regard to who drafted the Agreement or any particular provision of the Agreement. Neither the negotiations preceding this Agreement or any draft, term sheet, outline, note, or statement, assertion, representation, or understanding prior to or contemporaneous with the execution of this Agreement shall be used to interpret, change or restrict the express terms and provisions of this Agreement.

27. **Captions.** Captions are inserted herein for convenience, do not constitute part of the Agreement, and shall not be admissible for the purpose of proving the intent of the Parties.

28. **Counterparts.** This Agreement may be executed in counterparts, each of which will be considered an original.

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the dates indicated.

ATTEST:                                    **JUDICIAL WATCH, INC.**

_____          _____
Paul Orfanedes                            By: Thomas Fitton, President
Corporate Secretary                       Date: _____

_____
Witness

                                          **LARRY E. KLAYMAN**

                                          _____
                                          Date    9/19/03

_____                 **KLAYMAN & ASSOCIATES, P.C.**
Witness
                                          _____
                                          By: Larry E. Klayman, President
                                          Date    9/19/03

12